IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN



Mark F. Hoeltzel,

     Movant,

v.

                              CASE No. 2:18-CR-20111

                              HONORABLE Arthur Tarnow

United States of America,

     Respondent.

_____/

## MOTION FOR REDUCTION IN SENTENCE
## PURSUANT TO §3582

    COMES NOW, Mark Hoeltzel, pro se Movant/Defendant, and moves this Court to reduce his sentence based upon the extraordinary and compelling reason of his particularized risk of severe complications and death from COVID-19, and other factors that favor his reduction in federal sentence.

### JURISDICTION/STANDARDS

1. There exist four prerequisites to a court's granting compassionate release under the First Step Act of 2018. First, the defendant must have exhausted his administrative remedies with the BOP. Second, the defendant must demonstrate that "extraordinary and compelling reasons" warrant release. Third, the court must determine that the defendant is not a danger to society, or that any residual dangerousness is mitigated by conditions of release. And fourth, the court must weigh the factors set forth in § 3553(a). See § 3582(c)(1)(A).

2. Among the changes in the law created by the First Step Act, Congress amended the provision on compassionate release, 18 U.S.C. § 3582(c)(1)(A)(i). Prior to this amendment, only the BOP Director had the authority to file a motion for compassionate release. The newly amended law provides the sentencing judge

with jurisdiction to consider a defense motion for reduction in sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the Warden of the defendant's facility, whichever is earlier[.]" § 3582(c)(1)(A).

3. In order to determine if extraordinary and compelling reasons exist to release the movant, the Court must determine if a sentence reduction is "consistent with the applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A). The relevant portions of the applicable policy statement read as follows:

> 1. **Extraordinary and Compelling Reasons.**-- Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set below:
>
> (A) Medical Condition of the Defendant.--
>
> (i) The defendant is suffering from a terminal illness [...]
>
> (ii) The defendant is--
>
> (I) suffering from a <u>serious physical or medical condition,</u>
>
> (II) suffering from serious cognitive or mental impairment, or
>
> (III) experiencing deteriorating physical and mental health because of the aging process, [...]
>
> [...]
>
> (D) Other Reasons.-- As determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason <u>other than, or in combination with,</u> the reasons described in subdivisions (A) through (C). U.S.S.G. § 1B1.13 Note 1 (emphasis added).

## DISCUSSION / ARGUMENT

### I. HOELTZEL HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES

On October 16, 2020, Hoeltzel submitted an application for Compassionate Release

to Warden Hemingway of FCI-Milan via the TRULINCS electronic portal, as per FCI-Milan policy. See ATTACHMENT 1. Warden Hemingway denied Hoeltzel's request on November 6, 2020, conferring jursidiction to this Court pursuant to § 3582(c)(1)(A). ATTACHMENT 2.

## II. HOELTZEL'S CIRCUMSTANCES CONSTITUTE EXTRAORDINARY AND COMPELLING REASONS FOR COMPASSIONATE RELEASE

1. Hoeltzel is especially vulnerable to severe complications and death from COVID-19 due to his weight and congenital heart disease.[1]

   a) Mr. Hoeltzel was born with severe congenital heart disease, specifically severe congenital pulmonary stenosis, which required open heart surgery and a long hospital stay as a 4 year old.[1] The CDC states that people of any age with congenital heart disease (ie: "serious heart disease") have a high risk of severe complications and death from COVID-19.[2] To this day, Mr. Hoeltzel has to take steps to prevent infections that could affect his heart. He is to take preventative antibiotics any time he has dental work, and even the BOP has recognized his risk by giving him the adult pneumonia vaccine at a younger age than recommended.[1] Hoeltzel also has routine follow-ups with specialists in congenital heart disease and serial echocardiograms to monitor for complications of the disease and the previous surgical procedure. Because of the open chest surgery as a young boy, Hoeltzel is left with a lower than normal lung capacity that makes strenuous exercise difficult.

   b) Mr. Hoeltzel is overwieght.[1] Recent data have shown that obesity is one of the most important risk factors predictive of severe complications and death from COVID-19. So much so, that the CDC recently lowered the threshold Body Mass Index ("BMI") for people who may be at high risk for severe complications complications and death due to COVID-19 and their weight to 25.[2] Mr. Hoeltzel is 68 inches tall and weighs 180 pounds, giving him a BMI of 27.

-3-

c) These medical conditions combine to compound Mr. Hoeltzel's particular risk of severe complications and death from COVID-19. The CDC clearly states, "The more underlying medical conditions someone has, the greater their risk for severe illness."[2] Mr. Hoeltzel has shown he has conditions that put him at increased risk, and, as this Court has held, even if those "conditions do not independently and perfectly fit the definition of severity, as outlined by the CDC, all of his conditions compounded still place [the petitioner] in a much more vulnerable position than a healthy person." Loyd v. United States, 2020 U.S. Dist. LEXIS 89357 at 9 (E.D. Mich. May 21, 2020).

d) The government may erroneously attempt to argue that Hoeltzel's risk is actually minimal and doesn't rise to the level of extraordinary and compelling because his medical conditions are "managed" by the BOP. However, as other courts have pointed out, the CDC does not make a distinction between managed versus unmanaged disease when determining their relative risks.[2] "The Government argues that [the Defendant] does not fit the criteria for individuals at risk of severe illness because his COPD and hypertension have been effectively managed... But the CDC makes no such distinction." United States v. Kirschner, 2020 U.S. Dist. LEXIS 124496 (S.D. Ind. July 15, 2020) (rejecting government's 'disease is managed by the BOP' argument in granting compassionate release to a sex offender defendant from FCI-Milan.).

2. The Federal Bureau of Prisons, and specifically FCI-Milan where Mr. Hoeltzel is housed, have demonstrated that they are unable, and perhaps unwilling, to protect Mr. Hoeltzel, or any other inmate, from contracting COVID-19.

a) The COVID-19 crisis continues to rage unchecked across America. By early November, new cases were numbering well over 100,000 per day, with COVID-19 deaths hovering around 1000 per day. The University of Washington's Institute for Health Metrics and Education predicts "Cumulative deaths expected by January 1 are 410,000," and over half a million American deaths by early 2021.

There is little doubt that some of these additional deaths will be in the Federal Bureau of Prisons. The BOP has implemented a detailed plan to slow deaths within their facilities, but it hasn't been enough. The BOP's plan does not require prison staff to wear masks unless working with inmates with known positive COVID-19 tests, or unless the staff himself is positive for COVID-19.[3] That's correct. Current BOP policy allows COVID-19 positive staff to work in prisons as long as they wear a mask.[3] Of course, both of these policies fly in the face of plain common sense, unequivocal scientific evidence, and CDC recommendations. See, "When to Quarantine," CDC,[4] and "CDC Calls on Americans to Wear Masks to Prevent COVID-19 Spread," CDC.[5]

Perhaps this partly explains why the COVID-19 infection rate in the federal Bureau of Prisons is five-times that of the general population, with a similarly disproportionate COVID-19 death rate. ATTACHMENT 3 from www.federaldefenders.org. Regardless, Congress, the Department of Justice, and the Union representing prison workers all recognize that the BOP is not a safe place to be. See, CARES Act; Memoranda from Attorney General William Barr directing BOP facilities to release qualified inmates;[6] "Imminent Danger" complaint to OSHA from the Union representing BOP employees, detailing the BOP's failure to follow national safety guidelines.[7] And the BOP COVID-19 infection rate continues to climb,

despite the continued lack of universal testing. The week ending October

30 saw yet another double digit week-to-week percentage increase (18%) of

COVID-19 infections in BOP facilities.[8]

b) FCI-Milan is no exception. In fact, FCI-Milan has had more inmate deaths

and confirmed COVID-19 cases than the majority of BOP facilities.[8] And these

"official" numbers are likely a significant undercount of actual infections,

because the policy at FCI-Milan remains to only test symptomatic inmates.

In fact, if an asymptomatic inmate asks Health Services if they can be tested

for COVID-19, they are refused, because "there aren't enough tests." Still.

Of course, the government prosecutors love to quote these artificially low

numbers and point to them as evidence of the impeccable job that the BOP

is doing to thwart the pandemic against all odds. But most federal courts,

including this one, aren't fooled. Of FCI-Milan specifically, this Court

has observed, "[a]lthough the facility only has five active cases among its

inmate population... the fact that prisoners are only tested for the virus

if they [admit] symptoms suggests that the number may in reality be much

higher." United States v. Oliver, 2020 U.S. Dist. LEXIS 92839, at 17 (E.D.

Mich. May 28, 2020). See also, United States v. Amarrah, 2020 U.S. Dist.

LEXIS 80396, at 6 (E.D. Mich. May 7, 2020) ("Zero confirmed COVID-19 cases

is not the same thing as zero COVID-19 cases," discussing how the lack of

universal testing leads to inaccurately low numbers)(some emphasis original).

The lack of accuracy of actual case numbers is an inherent problem in the

BOP's COVID-19 response plan. See Re: Manrique, 2020 WL 1307109, at 1 (N.D.

Cal. Mar. 2020) ("The Bureau of Prisons management plan itself acknowledges

[that] symptoms of COVID-19 can begin to appear 2-14 days after exposure,

so screening people based on observable symptoms is just a game of catch-

up... We don't know who's infected.") (emphasis added).

c) The most recent boiler-plate Response from the Eastern District of Michigan's U.S. Attorney's Office attempts to mislead the Court by describing the BOP's lockdown procedures from <u>March</u>. Currently, FCI-Milan is open for business. Busses are bringing in inmates from other facilities, contractors are on site, and social visiting is open (actually expanded to 4 days a week from 2 days a week before the pandemic). Work details and programming that mix inmates from different housing units, and even allow inmates to leave the prison and return ("gate pass") are ongoing. This is all despite record-setting COVID-19 numbers in Michigan and Michigan's implementation of more COVID-19 restrictions, including "locking down" Michigan Department of Corrections ("MDOC") facilities.

d) And no matter the efforts of the BOP, the infrastructure of the nearly 90 year old FCI-Milan cannot be changed. Even Warden Hemingway admits in a now deleted memo that "social distancing of 6 feet cannot be achieved" at FCI-Milan. ATTACHMENT 4. Mr. Hoeltzel lives in F-Unit, a crumbling 90-year old 'open dormitory' style unit with no ventilation. There are no cells, walls, or doors, only rows of tightly packed bunk beds and lockers. Nearly 120 men share 1 (working) urinal, 1 ice machine scoop, 2 water fountains, 2 hot water stations, 3 (working) phones (2 of which are within 2 feet of each other), 5 computer terminals, 5 (working) toilets, 4 (working) showers, 10 sinks, and numerous door handles and high touch surfaces, none of which is cleaned more than one time a day. Let that sink in for a minute. One hundred and twenty men sharing a single working urinal. In the TV rooms, inmates sit shoulder to shoulder, and while lying in his bunk, Hoeltzel's face is within a few feet of two other prisoners' faces. It's no wonder the COVID-19 infection rate in dorm-style units is nearly three-times (42%) that of the rate in units with cells, like those found in the MDOC. See, "Studies Spotlight

-7-

High COVID-19 Infection Rate in U.S. Prisons," CENTERS FOR INFECTIOUS DISEASE
RESEARCH AND POLICY. See a video of Hoeltzel's FCI-Milan housing unit.[9]

e) Following BOP guidance, FCI-Milan designated a special housing unit for inmates
that it determined were high risk for COVID-19. "According to the government,
the procedures in the special housing unit, which are described in its motion
response as follows, have substantially mitigated or eliminated the risk
to [the defendant's] health: 'In mid-April 2020, inmates at FCI-Milan who
were identified as being potentially at risk for COVID-19 by Health Services
were assigned to live in C-Unit. The entire purpose of C-Unit is to mitigate
possible exposure for these at risk inmates...'" United States v. Nazzal,
2020 U.S. Dist. LEXIS 101391 at 4 (E.D. Mich. June 10, 2020) (quoting government's
motion response)(emphasis added).

Thus, C-Unit was FCI-Milan's pinnacle of response to COVID-19 that should
be envied and copied by all of the other facilities in the BOP. However,
on June 19, 2020, all inmates in C-Unit were tested for COVID-19 (only C-
Unit), and despite FCI-Milan's assertion that they had "substantially mitigated
or eliminated" their risk, 13 of 45 inmates tested positive. This incident
was referenced by another court in granting compassionate release to a sex
offender defendant from FCI-Milan: "As evidence by the recent infections
among prisoners in a high-risk population, the risk of contracting COVID-
19 in FCI Milan remains a daily threat, and that is entirely out of [the
Defendant's] control." United States v. Kirschner, 2020 U.S. Dist. LEXIS
124496 (S.D. Ind. July 15, 2020) at 9. Perhaps this occurred because the
BOP officers that worked in C-Unit came from home everday and didn't wear
masks. Regardless, instead of increasing precautions in C-Unit, FCI-Milan
emptied C-Unit, dispersing all of the high risk inmates into the general
population, including the dormitory units, without restesting them before
they were moved.

f) Perhaps those C-Unit correctional officers wanted to wear masks but weren't provided one. In a Union Complaint, FCI-Milan correctional officer Randy Hall reported that a fellow staff member that was escorting a symptomatic prisoner to the hospital was denied a mask or other PPE. Upon testing, the inmate was positive for COVID-19 (and later died), and ultimately the officer himself became infected and ended up in the ICU on a ventilator. But Officer Hall's primary complaint was that he (Hall) was <u>ordered back to work at FCI-Milan shortly after testing positive for COVID-19</u>. ATTACHMENT 5.

g) Additionally, both officers and inmates have brought FCI-Milan's COVID-19 reporting into question. For example, on October 28, 2020, there were 23 inmates in FCI-Milan's COVID-19 positive isolation unit (E-Unit). Any inmate or correctional officer involved in staffing E-Unit, or providing food and laundry to the inmates in E-Unit can attest to this. However, for whatever reason, FCI-Milan's official census indicates that there are 0 (zero) inmates in E-Unit, and the official COVID-19 case count on the BOP website is not more than a few inmates and staff.  ATTACHMENT 6 is a document from the FCI-Milan Food Services on which a correctional officer has hand written "23" next to E-Unit when calculating how many meals to deliver on 10-28-2020. As one can see, unlike the official (printed) census counts for the remainder of the housing units, the official census shows zero inmates in E-Unit... despite the fact that it is receiving 23 meals and 23 bed rolls, and has an officer on duty 24 hours a day. Something doesn't add up.

h) Importantly, this and other U.S. District Courts, and this U.S. Attorney's Office, have all recognized that despite the BOP's best efforts, COVID-19 is a true threat to the prisoners of FCI-Milan. "Here [Defendant] has presented sufficient evidence that FCI Milan is a high risk facility for contracting COVID-19." <u>United States v. Wilson</u>, 2020  U.S. Dist. LEXIS 132468 at 11 (S.D.

W.Va. July 27, 2020); "There is a current COVID-19 outbreak at FCI Milan, a facility which is not conducive to social distancing." United States v. Berry, 2020 U.S. Dist. LEXIS 123947 at 5-6 (E.D. Wis. July 15, 2020); "Continuing to incarcerate Defendant in an enclosed environment while the virus runs rampant, is a potentially deadly decision." United States v. Crider, 2020 U.S. Dist. LEXIS 133233 at 8 (E.D. Mich. July 28, 2020) (referring to FCI-Milan); "The Government itself concedes that FCI-Milan 'has experienced a major outbreak of COVID-19.'" United States v. Pomante, 2020 U.S. Dist. LEXIS 85626, at 15 (E.D. Mich. May 15, 2020). "Even if the Court were to accept the argument that BOP and FCI Milan are taking precautions to ensure the safety of the prisoners, the defendant's risk of contracting COVID-19 is not speculative." United States v. Saad, 2020 U.S. Dist. LEXIS 74949 (E.D. Mich.). As of 09/18/2020, the most recent BOP LEXIS update for prisoners, at least 10 FCI-Milan inmates have been granted compassionate release by this Court. ATTACHMENT 7.

i) FCI-Milan continues to hold compound-wide gaming tournaments for various card and board games, completely disregarding social-distancing recommendations, and encouraging vulnerable prisoners to do the same. ATTACHMENT 8. Also, on August 26, 2020, FCI-Milan restarted random breathalizer testing of inmates waiting in line for meals (well within 6 feet of each other), without sanitizing the breathalizer device between prisoners.

Time and again, Warden Hemingway and the other FCI-Milan administrators have demonstrated that they "just don't get it" when it comes to protecting inmates and staff, and it's not clear that they ever will.

j) Given (1) Mr. Hoeltzel's chronic health conditions, (2) his inability to practice social distancing and other CDC recommended precautions at FCI-Milan, and (3) the demonstrated failure of the BOP and FCI-Milan to stop

the spread of COVID-19, this Court should find that the totality of Mr. Hoeltzel's circumstances are sufficiently extraordinary and compelling to warrant granting compassionate release.

k) Recall that Mr. Hoeltzel is serving his current federal sentence concurrently with a State of Michigan sentence, and the State of Michigan has appropriately placed a detainer on Mr. Hoeltzel, meaning that when Mr. Hoeltzel is released from the BOP, whether it's now or in the future, he will be released to the custody of the Michigan Department of Corrections to complete his 5-15 year state sentence. Mr. Hoeltzel has established that state prison is likely safer for him than federal prison based upon the foregoing. More importantly, this Court has already set the precedent of granting a federal prisoner compassionate release from the BOP to the Michigan Department of Corrections. See, Tubbs-Smith v. United States, 2020 U.S. Dist. LEXIS 116626 (E.D. Mich July 2, 2020) (A. Tarnow) (Defendant released to the custody of the MDOC after completing just short of 13 months of a 120 month mandatory minimum sentence

### III. MR. HOELTZEL'S DANGEROUSNESS

1. Mr. Hoeltzel's current dengerousness to society is not directly relevant to this motion because he is asking to be released to custody of another law enforcement agency. However, the Court must still consider it. So, Mr. Hoeltzel presents the following facts and argument.

2. The BOP itself has determined that Mr. Hoeltzel is LOW risk for recidivating using the Prisoner Assessment Tool Targeting Estimated Risks and Needs ("PATTERN"). This evidence-based "risk and needs assessment system is used to determine the risk and needs of inmates in BOP custody. Specifically, the system determines the recidivism risk of each inmate and assigns them a recidivism score..," quoting FEDERAL BUREAU OF PRISONS website.[10] Importantly, the PATTERN assessment system factors into the score whether the inmate's primary offense is a sex offense. Using PATTERN, the government's own assessment of Mr. Hoeltzel's recidivism risk if he were released into the community today is LOW. ATTACHMENT 9.

3. Mr. Hoeltzel is a first-time offender with strong community ties. He acknowledges the seriousness of his crimes, and he reflects upon them daily with remorse and a desire to make amends. He fully understands that pleading guilty in a timely manner and paying off all of his fines and restitution were just the first steps in taking accountability for his conduct and the harm it caused. It is also important to note that Mr. Hoeltzel was on pre-trial release for 11 months with no infractions.

4. Since his incarceration, Mr. Hoeltzel has worked to better himself and help others. He has completed about a dozen rehabilitation programs, including Parenting, The Addictive Mind, Drug Education, and Psychology Self-Help. He also attended the prison's Alcoholics Anonymous meeting before it was discontinued due to the pandemic. Mr. Hoeltzel is on the wait list for many other programs, including Sex Offender Treatment, Non-Residential Drug and Alcohol Treatment

-12-

Program, Criminal Thinking, and Basic Cognition (see below for a detailed discussion of the lack of rehabilitation opportunities in the BOP). He's added to his employable skills working in the prison factory (Unicor) and works fulltime as a clerk in the prison law library where he is sought after for his patience, knowledge, and willingness to help. Note that he has written and briefed his own 2255 motion currently in front of this Court, and written the initial pro se briefs for two fellow inmates who successfully obtained compassionate release, including one heard in front of this Court.[11] Mr. Hoeltzel has earned every Good Time credit available to him and has never received a disciplinary infraction. He was hand selected by prison staff to live in the Honors Unit, before the concept of the unit was abondoned by the current Warden. He is the proverbial "model inmate." ATTACHMENT 10.

5. If released to the MDOC, it is possible that Mr. Hoeltzel could be released into the community short of the full term of his original federal sentence. He will be eligible for state parole in just over 3 years, and may pursue compassionate release from state prison. In such a case, any residual danger that Mr. Hoeltzel represents will be mitigated by some combination of state parole, federal supervised release, and lifetime sex offender registry. Thus, this Court has the authority to enforce and/or alter the conditions of his federal Supervised Release.

a) Even for sex offenders, "the safety of the community can be protected in other ways than incarcerating the defendant." United States v. Dillard, 2020 U.S. Dist. LEXIS 90865, at 6 (D. ID. Apr. 27, 2020) (sex offender released to supervised release with added conditions). Incarceration is not the only "kind[] of sentence available" to Mr. Hoeltzel. § 3553(a)(3). Non-custodial sentences such as supervised release, parole, and home confinement also "curtail prized liberty interests" and "the defendant always faces the harsh

consequences that await if he violates the conditions" attached to such supervision. United States v. Gall, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005). This Court has the authority to restrict Mr. Hoeltzel's travel, movement, communications, internet usage, and interactions with others to whatever extent it thinks necessary when Mr. Hoeltzel is released into the community.

b) Given these post-release supervision options, federal courts have felt comfortable    granting compassionate release to dozens of federal sex offenders. ATTACHMENT 11. Some relevant examples include:

i) United States v. Musumeci, 2020 U.S. Dist LEXIS 74699 (S.D.N.Y. Apr. 28, 2020) (Inmate convicted of enticement of a minor and production of child pornography released to modified supervised release. Court cites significantly shorter state sentence for the same crimes as a factor, declares resulting federal sentence "Draconian.");

ii) United States v. Kirschner, ibid, (FCI-Milan sex offender released to supervised release. Court cited clean record during pre-trial release and the fact that he will be monitored by some combination of supervised release and sex offender registry for the rest of his life as factors);

iii) United States v. Bandrow, 2020 U.S. Dist. LEXIS 127031 (E.D. Mich. July 20, 2020) (sex offender received the mandatory minimum 60 month sentence despite a guideline range of 210-240 months, he was then granted compassionate release by this Court after serving only 18 months in prison);

iv) Frushour v. United States, 2020 U.S. Dist. LEXIS 146657 (E.D. Mich. Aug 14, 2020) (sex offender with an admitted history of contact and production conduct against minors granted compassionate release from FCI-Milan. This Court cited clean pre-trial release, spotless prison record, and PATTERN recidivism score as factors).

-14-

v) <u>United States v. Brown</u>, 2020 U.S. Dist. LEXIS 187821 (E.D. Mich. Oct. 9, 2020) (Defendant convicted of the three felonies of kidnapping a minor, transporting her across states lines for sexual purposes, and forcibly sex trafficking her. He also raped her. Granted compassionate release.);

vi) <u>United States v. Godlewski</u>, 2020 U.S. Dist. LEXIS 187617 (E.D. Mich. Sept. 11, 2020) (Defendant traveled for the purpose of raping a minor he coerced online, convicted of 2422(b) and receipt of child pornography. Granted compassionate release from his 121 month sentence);

vii) <u>United States v. Graver</u>, 2020 U.S. Dist. LEXIS 192556 (S.D. Iowa Sept. 29, 2020) (Defendant convicted of coercion of a minor and possession of child pornography granted compassionate release).

c) Mr. Hoeltzel is willing to abide by all current and added terms and conditions of supervised release, including home confinment, an extended or delayed term, location monitoring, internet restrictions, sex offender treatment, sex offender registry (already registered in Michigan), and any other conditions deemed appropriate and necessary by this Court.

### III. § 3553(a) FACTORS WEIGH HEAVILY IN FAVOR OF RELEASING HOELTZEL FROM HIS FEDERAL SENTENCE

1. Mr. Hoeltzel's federal time-served is sufficient punishment, particularly given that his punishment will continue in state prison, on state parole, on federal supervised release, and on the sex offender registry for the rest of his life. Recall that in Bandrow, ibid, the sex offender defendant only served 18 months of his 60 months sentence (with a prior guidelines recommendation of 210-240 months) before being granted compassionate release. This Court opined,

> [Defendant], who never spent a day in custody before this offense, has served more than 18 months of his sentence. He has already suffered meaningful and substantial punishment for his crimes. Moreover, [Defendant] will suffer additional restrictions on his liberty through the home confinement condition that the Court will impose. [Defendant's] time served plus the continued restrictions on his freedom of movement from the home confinement condition imposed by the Court, together, satisfy the goal of imposing sufficient punishment.
> [...]
> Further, he has served a not insubstantial sentence in prison, and that lengthy period of custody is also long enough to achieve deterrence.

In contrast, Mr. Hoeltzel has served approximately 23 months in prison, and will be serving more in state prison.

2. Releasing Hoeltzel does not diminish deterrence or respect for the law. This Court recognized as much, and stated the logic behind its conclusion in United States v. McConico, 2020 U.S. Dist. LEXIS 135718 (E.D. Mich. July 31, 2020):

> A reduction in [Defendant]'s sentence will not diminish the general deterrent value of [Defendant]'s original ten-year sentence. Individuals contemplating criminal behavior could hardly be expected to rely on an unforeseen event on par with a pandemic to reduce the prison sentences they would risk by their actions. Nor does a reduced sentence threaten to diminish respect for the law. Respect for the law is promoted by demonstrating its humanity as much as its rigidity. (emphasis added).

3. § 3582 gives this Court the discretion to depart from the mandatory minimum. Recall that this Court used its sound discretion to sentence Hoeltzel to the below guideline mandatory minimum of 120 months, however the Court's hands were tied to depart any further based upon Hoeltzel's history, characteristics, and other mitigating factors. "The [Sentencing] Commission also acknowledges that '[s]ince the power to determine the charge of conviction rests exclusively with the prosecution for the 85 percent of the cases that do not proceed to trial, mandatory minimums transfer sentencing power from the court to the prosecution.'" United States v. Strayer, 2010 U.S. Dist. LEXIS 62719 at 27 (D. Neb. 2010) (justifying a downward departure to 60 months from a guideline recommendation of 210-240 months for a sex offender) (quoting "Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System," UNITED STATES SENTENCING COMMISSION). Therefore, that charging/sentencing decision is made by the prosecutor before they or the Court knows anything else about the defendant other than his offending conduct because sentencing memoranda have not yet been filed and a pre-sentencing investigation has not yet been performed. This precludes the court from using its sound discretion to craft a sentence that fits the defendant and his conduct as a whole, thus introducing unintended disparity into the sentencing determination. Numerous courts across the country have granted compassionate release to offenders who had not yet served their mandatory minimum. See Tubbs-Smith, ibid.

4. The current mandatory minimum for §2422(b) has created a 'conduct disparity,' meaning offenders who committed differing severities of conduct all receive the same sentence. One can look to the criticism of child pornography sentencing to understand how this came about.

A lot of attention has been paid to the serial increase in mandatory minimum prison terms and sentence enhancements for child pornography offenders. The Sentencing Commission, a majority of federal judges, and a significant number

-17-

federal jurors believe that sentencing reform for child pornography crimes
is needed because the guideline recommendations based upon the current scheme
are too harsh for most offenders. See, "Federal Child Pornography Offenses,"
UNITED STATES SENTENCING COMMISSION; "Results of Survey of United States District
Judges," UNITED STATES SENTENCING COMMISSION; United States v. Polizzi, 549
F. Supp. 2d 308 (E.D.N.Y. 2008) (when polled by the judge after reaching a
guilty verdict for a child pornography defendant, a significant number of
jurors said that they would have voted for acquittal had they known that the
defendant now faced a minimum of 60 months in prison because they did not
believe that the punishment fit the crime. New trial granted.).

This overly-harsh sentencing scheme is the result of two phenomena. First,
sentences and sentence enhancements for child pornography crimes have been
serially increased by Congress without expert committee input or a basis in
empirical data, which is a departure from the Sentencing Commission's usual
methodology. "[T]he child pornography Guidelines are driven by Congressional
directive and are not grounded in any scientific, statistical, or empirical
method. The advice imparted in the Guidelines does not reflect the sort of
empirical data, national experience and independent expertise that characterize
the Sentencing Commission's institutional role. Given the flaws in the Guidelines
scheme for punishment of internet child pornography crimes, they need not
be accorded a high degree of deference by the court." Strayer, ibid at 38.

Second, the advances in technology used by child pornography offenders
have outpaced the intent of the enhancements in §2G2.2 of U.S.S.G., and the
result is that nearly every enhancement applies to every offender. See, "Federal
Child Pornography Offenses," U.S.S.C. Consequently, the original intent of
the enhancements scheme to differentiate between more serious and less serious
offenders, or "aggravated" and "mine-run" offenders, has been lost, and the
majority of child pornography offenders end up with Guidelines recommendations

-18-

at or near the statutory maximum. Id. Also, see Strayer, ibid.

While the government will argue that the current sentencing scheme reflects Congressional intent to punish child pornography offenders more harshly, this argument is disingenuous at best. Congress's true intent is obvious... to get re-elected and not lose donor support. Voting in favor of child sex offenders would simply be political suicide.

This applies to Hoeltzel for two reasons. First, Hoeltzel's Guideline sentencing range reocmmendation was based on the child pornography Guidelines (§2G2.2). More importantly, while less attention has been paid to §2422(b), the story and resultant sentencing problems are the same. The history of penalties for §2422(b) tracks with that of child pornography penalties. Prior to the 1998 PROTECT Act, §2422(b) had no mandatory minimum, however the Act established a mandatory minimum of 60 months, without U.S.S.C. input. Then in 2006, again without empirical basis, the Adam Walsh Act increased the mandatory minimum for §2422(b) to its current 120 months. (Also note that the statutory maximum for §2422(b) was serially increased over those 8 years from 15 years to life).

A comprehensive review of §2422(b) cases on the BOP LEXIS database with available sentencing data (ATTACHMENT 12) shows that, before any mandatory minimum was instituted, the average sentence for §2422(b) alone was just 30 months. When convicted of multiple charges, the average sentence was 68 months. When 60 months became the mandatory minimum, the average §2422(b) sentence was at or near 60 months. And when 120 months became the mandatory minimum, the average §2422(b) sentence became 120 months.

This bunching of §2422(b) sentences at the mandatory minimum reveals that courts believe the current sentencing scheme for §2422(b) to be too harsh. More importantly, this bunching at the mandatory minimum has created a conduct disparity, meaning that defendants with a wide range of conduct under §2422(b), from 'aggravated' to 'mine-run,' all received the same sentence of 120 months.

-19-

The LEXIS database contains 48 cases of defendants convicted of §2422(b) (and often other charges) who were sentenced to the mandatory minimum of either 60 months or 120 months. Forty-seven of those (98%) arranged to meet, and traveled to meet their victim, sometimes thousands of miles, with the intent to sexually assault them. Others actually raped their victims. See, e.g., States v. Johnson, 183 F.3d 1175 (10th Cir. 1999) (convicted of §2422(b) and possession of child pornography after coercing and then raping his minor victim. Sentenced to 27 months); United States v. Davis, 2011 U.S. Dist. LEXIS 76199 (E.D. Mich. 2011) (defendant enticed his 14 year old cousin to create and exchange child pornography, and raped her, received 120 months on a single count of §2422(b)); United States v. Martin, 2020 U.S. Dist. LEXIS 135567 (W.D.N.Y. July 30, 2020) (Defendant enticed a minor online "and had sexual intercourse with the minor on multiple occasions," at 7. Received 120 months on one count of §2422(b)).

Recall that Mr. Hoeltzel, although his crimes were very serious and morally reprehensible, never arranged to meet, tried to meet, traveled to meet, or met, let alone raped, his minor victim in this case. In other words, his conduct was substantially less severe than the average §2422(b) defendant who received the same 120 month prison sentence. Hoeltzel could only find one analagous case of a defendant who received the mandatory minimum 120 sentence without trying to meet his victim, and that defendant was granted compassionate release prior to completing his 120 month sentence. United States v. Siegert, 2020 U.S. Dist. LEXIS 148471 (S.D. Fla. Aug 13, 2020).

5. The Congressionally mandated mandatory minimum of 120 months for Hoeltzel's § 2422(b) crime also creates more classic sentencing disparities. The "Congressional intent" argument again fails here, unless one truly believes that Congress intended to punish child pornogrpahy and child coercion offenders more severely than those who actually rape children. Make no mistake, there

is <u>no mandatory minimum</u> federal sentence for raping a child. And this is not just a hypothetical disparity. See, e.g., <u>United States v. Chapman</u>, 796 Fed. Appx. 229 (5th Cir. 2020) (defendant sentenced to 24 months for "raping a 15 year old girl."); <u>United States v. Lindsay</u>, 931 F.3d 852 (9th Cir. 2019) (defendant received 96 months for raping and sexually abusing a 12 year old repeatedly over a period of 4 years); <u>United States v. Gatlin</u>, 216 F.3d 207 (2d Cir. 2000), the defendant received 51 months for "regularly" raping a 13 year old girl over the period of a year and a half. The same disparity exists with forcibly sex trafficking a child (See, e.g., <u>United States v. Brooks</u>, 610 F.3d 1186 (9th Cir. 2009) (defendant convicted of forcibly sex trafficking two teenage runaways (1591) and transporting a minor for the purpose of sexually explicit conduct (2423), and received 97 months)), and traveling across state lines to rape a child. See, e.g., <u>United States vs. Garate</u>, 543 F.3d 1026 (8th Cir. 2008) (defendant convicted of 2 counts of 2423 for traveling across state lines twice and having "oral, anal, and vaginal intercourse" with a 12 year old, and received 30 months. Sentence affirmed on appeal by the government). You get the idea.

6. The other obvious sentencing disparity created is the disparity with the equivalent state sentence. If convicted of the same crime by the State of Michigan, Hoeltzel would have faced a sentence of 0-48 months rather than 120 months to life; a substantial difference. MPC 750.145a.

7. One type of sentencing disparity generally overlooked by the courts is <u>punishment disparity</u>. Through research, experience, and empiric data, we now know that sex offenders have among the lowest rates of prison violence, escape attempts, and recidivism. See, "How Dangerous Are They? An analysis of Sex Offenders Under Federal Post-Conviction Supervision," UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE (2016); "Recidivism of Sex Offenders Released from State Prisons,"

U.S. DEPT. OF JUSTICE, BUREAU OF JUSTICE STATISTICS (2019); "Federal Child Pornography Offenses," UNITED STATES SENTENCING COMMISSION (2012); Academic footnotes 12-15. Despite this knowledge, the BOP continues to punish sex offenders ("SO's") more harshly than other groups of offenders with the same sentences and security classifications. The BOP categorically restricts SO's from contact with their family and friends by denying them access to the strictly monitored BOP email system. SO's are categorically excluded from several work details that have no relation to their offense or risk level. SO's are categorically excluded from all minimum security facilities ("camps"), furlough, and work release, even if they have a negative "custody score." SO's are excluded from all early release programs, including CARES Act Home Confinement, First Step Act Early Release Credits, and early release for completing drug treatment. For the handful of SO's that are lucky enough to receive BOP sex offender treatment, there is no opportunity for early release like that given to other offender groups for completing drug treatment. And, BOP staff openly foster an "anti-sex offender" atmosphere among other inmates and their colleagues. ATTACHMENT 13.

The result is that sex offenders spend more time in federal prison than other categories of offenders with the same sentence, that time in federal prison is more difficult, and SO's have fewer ways to acquire vocational skills and foster the social supports that are crucial to their success upon release.

The BOP attempts to justify this punishment differential by citing 'public safety' without any empiric data regarding escape or recidivism risk that actually support their reactionary and substantially unreasonable policies. Meanwhile, the courts generally ignore these glaring punishment disparities, particularly when deciding sentences for sex offenders.

This punishment disparity directly impacts Hoeltzel. Because he is a sex offender, he has been denied access to the BOP's heavily monitored email system, impacting both his parenting and general social connections. FCI Milan offers

-22-

an excellent program where inmates can record themselves reading books to their children and then send the book and the recording home to their young kids. Hoeltzel has been denied this opportunity because sex offenders are categorically excluded. And even though Congress expressly did not include §2422(b) as an "excluded offense" for First Step Act Early Release Credits, the BOP has ignored this particular Congressional intent and told Hoeltzel he does not qualify because "sex offenders don't get early release." Etc. Etc.

8. Hoeltzel's state detainer also contributes to his punishment disparity in federal prison. Without the state detainer, Hoeltzel would be able to spend the last 12 months of his sentence in a Residential Reentry Center, and the last 6 months in Home Confinement. His detainer excludes him from both. And despite his alcohol abuse problem, Hoeltzel's detainer automatically disqualifies him from the intensive residential drug program offered at FCI-Milan, which he would like to participate in.

9. Hoeltzel's lack of opportunities for rehabilitation weighs in favor of his release from federal prison. One of the purposes of sentencing is rehabilitation, and arguably, Hoeltzel would benefit most from sex offender treatment. Recall that Hoeltzel is a recovering sex addict who was already benefiting from sex offender treatment prior to his incarceration. Long before he caught his case, he recognized that he needed to change and began regularly attending 12-step meetings sponsored by Sex Addicts Anonymous ("SAA"). When the warrant was issued for his arrest, he was voluntarily participating (and paying for) residential sex offender treatment in Philadelphia, a program that the government, in their sound discretion and compassion, allowed him to complete. After completion, Hoeltzel continued his path toward accountability by flying back to imminent arrest. Compassionately, the federal magistrate judge granted Hoeltzel pre-trial release (and this Court continued it) for the express purpose of

continuing his rehabilitation in the community, which he did. Hoeltzel met with

a government appointed mental-health therapist every-other-week, and recognizing

his opportunity, he also paid out of pocket for weekly treatment with a sex

offender therapist (3 hour round trip), and attended two 12-step meetings weekly.

Once he learned of the opportunity to participate in BOP/MDOC community group

sex offender therapy, he asked his federal parole officer to be referred, and

then started additional one-on-one and weekly group sex offender treatment...

the same sex offender treatment provided to federal inmates upon release. In

sum, in the 11 months Hoeltzel was on pre-trial release, he participated in

twice a week individual therapy and four times a week group therapy for sex

offending, sex addicition, alcohol abuse, depression and anxiety. He never felt

better, and he received support letters from every one of his therapists attesting

to his progress, his amenability to treatment, and his low risk of recidivism.

Even the government acknowledged the sincerity of his rehabilitative efforts

at sentencing. And then he self-surrendered to the care of the BOP, and all

therapy stopped. Ended. Kaput.

Recall that Hoeltzel requested incarceration in FCI-Elkton because he knew

it was one of the few BOP facilities that offered sex offender treatment;

despite that fact that it was many hours further away from his young family

than FCI-Milan. Recall that this Court formally recommended that Hoeltzel be

designated to FCI Elkton specifically for sex offender treatment. But as the

BOP often does, it ignored the Court's recommendation, and placed Hoeltzel at

FCI-Milan. This Court, at sentencing, expressed its concern that Hoeltzel's

therapeutic gains would stall out or regress in prison, and, unfortunately,

those concerns have come to fruition.

Hoeltzel described all of his therapeutic efforts and his desire for ongoing

therapy to Psychology at FCI-Milan. They inexplicably determined he needed no

regular therapy. Hoeltzel specifically asked for sex offender treatment of any

-24-

kind at FCI-Milan, and he was refused. FCI-Milan houses hundreds of sex offenders, and yet the _only_ resources for sex offenders at FCI-Milan are two books locked in a cabinet in the psychology department that can only be accessed with special permission through the "Psychology Self-Study Program." Hoeltzel has enrolled in that program for lack of any other support, worked his way through the first book, and is now working on the second. Sadly, at the end of each chapter, the books advise discussing the issued covered with "your therapist," yet the BOP psychologists refuse to provide such assistance. Hoeltzel was also told by his BOP psychologist that the BOP "does not believe in sex addiction" and _cannot_ guarantee that he will receive SO treatment before his release, despite this Court's recommendation. Thus, Hoeltzel's continued incarceration in the BOP seems to be of little purpose. In contrast, the Court can be reassured that the MDOC will not grant Mr. Hoeltzel parole until he has completed MDOC sex offender treatment, which is clearly more accessible than BOP sex offender treatment. Sex offender treatment is also clearly more available in the community than in the BOP (the defendant in _Frushour_ started community sex offender treatment within weeks of his compassionate release by this Court). Therefore, the §3553(a) factor of rehabilitation weighs in favor of Hoeltzel's release form the BOP.

## MDOC RELEASE PLAN

If released to the MDOC, Mr. Hoeltzel's top priority will be to enroll in Sex Offender treatment, and any other rehabilitation or self-improvement programs available to him. He would also like to teach an adult continuing education course. He plans to complete correspondence training in paralegal studies, and hopes to be a law clerk and continue to help other prisoners navigate the complexities of the criminal justice system, while preparing himself for a desired future career in the law. He will continue to nurture his connections with his family and friends, and continue to develop contacts in the 'outside' sentence and

prison reform communities. He also plans on exploring his opportunities for training in addiction counseling. His housing and healthcare will be in the custody of the MDOC.

<u>COMMUNITY RELEASE PLAN</u>

Upon eventual release into the community, Hoeltzel plans to live and work in or near Ann Arbor, MI, where he plans to rent an apartment so that he can be close to his young children (who currently live in a house likely disqualified by the Michigan Sex Offender Registry). He plans to continue his treatment and recovery through community sex offender treatment and resumed participation in the sex addiction 12-step community. While he can always fall back on the medical writing skills he honed as an academic physician to support himself, Hoeltzel prefers work that allows him the opportunity to make a positive impact in people's lives. He plans to work as a paralegal in a criminal defense firm while developing his skills in legal advocacy for sex offenders, and treatment advocacy for other sex addicts. He hopes to attend law school to increase his skills and opportunities in these areas. He will also explore opportunities in addiction counseling. He feels that his skills as a physician, educator, and recovering addict and sponsor are well-suited to help other addicts, but understands that current licensing laws may prevent him from such work. Hoeltzel already has healthcare established for both his heart disease and his general medical needs at the University of Michigan, and he already has sex offender and sex addiction therapists established in both southeastern Michigan and the Kalamazoo area.

<u>CONCLUSION</u>

In sum, Hoeltzel has demonstrated a number of circumstances that favor his compassionate release from federal prison, including (1) his particularized risk of severe complications and death from COVID-19, (2) his particularized risk of contracting COVID-19 in federal prison, specifically at FCI-Milan, (3) his

government-determined low risk of recidivism, (4) his history and characteristics, (5) sentencing disparities created by federal law, (6) unreasonable punishment disparities created by the Federal Bureau of Prisons, and (7) lack of rehabilitation opportunites in federal prison that undermine the purpose of his original federal sentencing. This totality of circumstances constitutes extraordinary and compelling reasons warranting compassionate release. See Note 1(D), § 1B1.13 of U.S.S.G. (recognizing that extraordinary and compelling reasons exist "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Mr. Hoeltzel's circumstances fall with the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes extraordinary and compelling reasons to warrant sentence reduction, the inquiry does not end there. Rather, the district courts have the freedom to shape the contours of what constitutes extraordinary and compelling reasons to warrant compassionate release. See, <u>United States v. Zullo</u>, 2020 U.S. App. LEXIS 30605 (2d Cir. Sept. 25, 2020) ("The First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.")

On a more personal note, Mr. Hoeltzel has enjoyed writing this motion, and, even if denied, he hopes that it has brought attention to some of the issues sex offenders face in the federal criminal justice system, and hopes that having it publically available might help other similar defendants in the future.

<u>On Appointed Counsel</u>

If this Court should choose to appoint Mr. Hoeltzel legal counsel for this proceeding, he asks for the same counsel appointed by this Court and currently representing Mr. Hoeltzel for his 2255 motion pending before this Court: Nicole Smith of Smith and Minhas in Wyandotte, Michigan.

-27-

WHEREFORE, Mark Franklin Hoeltzel, pro se Movant/Defendant, respectfully requests this Honorable Court to GRANT his Motion for Compassionate Release and ORDER that he be released to the custody of the Michigan Department of Corrections.

Respectfully Submitted,

DATE: 11/18/2020

Mark Hoeltzel
pro se
Reg. No. 56366-039
FCI Milan
P.O. Box 1000
Milan, MI. 48160

## CERTIFICATE OF SERVICE

I, Mark Hoeltzel, certify under penalty of perjury, that this document was filed with the Court, and a true copy of this document filed with the U.S. Attorney's Office, by placing both into the institutional mailing system, pre-paid U.S. Mail, on November 19, 2020.

## REFERENCES / ATTACHMENTS

1. Hoeltzel has not yet received a response from his October BOP request for medical records. ATTACHMENT 14. He will file them as a Supplement with the Court upon receipt.

2. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

3. https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf

4. https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html

5. https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html

6. Memoranda from Attorney General to the Bureau of Prisons, both available at https://www.justice.gov/coronavirus/DOJresponse

7. https://www.govexec.com/oversight/2020/04/federal-prisons-pose-iminent-danger-spreading-covid-19-union-says/164390

8. https://www.bop.gov/coronavirus

9. https://www.youtube.com/watch?v=1RAXSVCkDQM  Relevant portion starts at approximately 2 minute mark.

10. https://www.bop.gov/inmates/fas/faq.jsp#fsa_system

11. United States v. Fortson, 2020 U.S. Dist. LEXIS 122035 (S.D. Ind. July 13, 2020) (Defendant granted compassionate release to care for his 10 year old son after the unexpected death of his son's mother); Frushour v. United States, 2020 U.S. Dist. LEXIS 146657 (E.D. Mich. Aug. 14, 2020) (Sex offender defendant granted compassionate release due to health concerns in the context of COVID-19, and to care for his ailing wife).

12. "The Criminal Histories and Later Offending of Child Pornography Offenders," SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT (2005).

13. "The Consumption of Internet Child Pornography and Violent Sex Offending," BMC PSYCHIATRY (2009).

14. "Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters," SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT (2007).

15. "Child Pornography Possessors and Child Contact Sex Offenders: A Multilevel Comparison of Demographic Characteristics and Rates of Recidivism," SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT (2014).

ATTACHMENT 1

TRULINCS  56366039 - HOELTZEL, MARK FRANLIN - Unit: MIL-F-D

----------------------------------------------------------------------------------------------------

FROM: 56366039
TO: MIL/RISCoordinator
SUBJECT: ***Request to Staff*** HOELTZEL, MARK, Reg# 56366039, MIL-F-D
DATE: 10/16/2020 03:48:10 PM

To: Warden Hemingway
Inmate Work Assignment: library

I wanted to add to my Reduction in Sentence Application that I submitted to you yesterday another extraordinary and compelling reason:
The sentencing disparity between federal and state statutes for the same crime. My crime federally results in a sentence of 10 yrs to life, however in the State of Michigan, the penalty is 0-4 years of imprisonment. This is particularly compelling for me because my case was a state case until the vindictive local police officer referred me to federal prosecutors... and decision that's beyond her discretion, and should only be between prosecutors.

Has I been properly prosecuted only in the state, I would likely be home by now.
thank you,
mark hoeltzel
-----HOELTZEL, MARK FRANLIN on 10/15/2020 6:54 PM wrote:

>

I am applying for Reduction In Sentence pursuant to Section 3582 and United States v. Zullo (3rd Cir, Sept 25, 2020), for the following reasons:

1. I'm at high risk for severe complications and death from COVID-19 due to the following helath conditions:
a) heart murmur from congenital pulmonary stenosis, a serious heart condition
b) overweight
c) hypercholesterolemia

2. Sentencing disparities created by my mandatory minimum sentence:
a) the judge expressed his displeasure with having to give me the mandatory minimum of 10 years
b) offenders who actually sexually abuse children receive less time

3. Lack of rehabilitation: No sex offender therapy available to me or any of the other hundreds of sex offenders here at Milan.

4. Pre-trial release time on home confinement (11 months) should have been credited against my sentence because it constituted punishment.

5. Having a detainer precludes me from RDAP (lack of available rehabilitation) (don't qualify for 12 months off)

6. Having a detainer precludes me from 12 months of halfway house

7  Being a sex offender precludes me from CARES Act Home detention

8. Being a sex offender precludes me from email contact with my family and friends

9. Being a sex offender precludes me from being transfered to a minimum security facility despite having a minimum security designation.

10. Being a sex offender precludes me First Step Act Early Release Credits.

11. Being a sex offender precludes me from Gate Pass and work details that do not hire sex offenders (Unicor maintanance, Unicor tool and die, etc)

12. Being a sex offender precludes me from the program where you record books for your children.

All of the above contributes to a totality of extraordinary and compelling circumstances warranting a reduction in sentence.

TRULINCS  56366039 - HOELTZEL, MARK FRANLIN - Unit: MIL-F-D

--------------------------------------------------------------------------------

Release Plan: If released early, I will live in an MDOC prison, obtain a job in an MDOC prison, participate in rehab in an MDOC prison, and receive my medical care in an MDOC prison.

Thank you for considering my request.
mark hoeltzel

ATTACHMENT 2

**RESPONSE TO REQUEST FOR REDUCTION IN SENTENCE**      November 4, 2020
HOELTZEL, Mark Franlin                                              F2 Unit
Reg. No: 56366-039                                              RIS Request

Your request for Compassionate Release/Reduction in Sentence (RIS) has been reviewed pursuant to 18 U.S.C. 3582 (c)(1)(A).   We will not be pursuing a request for compassionate release in your case.

A review of your request reveals you have submitted a request for a reduction in sentence based on inmates with a debilitating medical condition.

Program Statement 5050.50, states a request for a motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) shall be submitted to the Warden.   Ordinarily, the request shall be in writing, and submitted by the inmate.   An inmate may initiate a request when there are particularly extraordinary or compelling circumstances which could not be reasonably have been foreseen by the court at the time of sentencing.   The criteria for a RIS request as an inmate with a debilitated medical condition requires that you are experiencing a deteriorating mental or physical health condition that substantially diminishes your ability to function in a correctional facility and conventional treatment promises no substantial improvement to your mental or physical condition.   Further you can carry on self-care and are not confined to a bed or chair more that 50% of waking hours.

The Bureau of Prisons (BOP) is carefully monitoring the spread of the COVID-19 virus and taking extraordinary measures to contain it. As with any type of emergency situation, we carefully assess how to best ensure the safety of staff, inmates and the public.

Your current condition, with or without the spread of the COVID-19 virus, does not meet the criteria outlined in the paragraphs above. We recognize that you, like all of us, have legitimate concerns and fears about the spread and effects of the virus. However, your concern about being potentially exposed to, or possibly contracting COVID-19 does not currently warrant an early release.

Accordingly, your request for Reduction in Sentence is denied.   In the event you are not satisfied with this response and wish to appeal, you may contact your Unit Team to initiate an appeal in accordance with the Administrative Remedy Program.   Please note, this appeal process begins with a BP-9 (Warden level).

I trust this addresses your concerns.


_____                    11/6/20
Jonathan Hemingway, Warden                              Date

ATTACHMENT 3

## COVID-19 Rate of Infection for Various Populations

| Location | Cases | Population | Infections/1,000 People | Infection Rate as Percent of Population |
|---|---|---|---|---|
| Bureau of Prisons (federal) | 15,237[3] | 140,733[3] | 108.27 | 10.8269% |
| United States | 7,504,116 | 330,412,610[4] | 22.71 | 2.2711% |
| China | 90,678[5] | 1,394,015,977[6] | 0.07 | 0.0065% |
| Italy | 330,263[7] | 62,402,659[8] | 5.29 | 0.5292% |

| BOP Rate of Infection Compared to Various Populations | |
|---|---|
| Compared to the United States: | 4.77 |
| Compared to China: | 1664.44 |
| Compared to Italy: | 20.46 |

### COVID-19 Infections per 1,000 People

86.07  17.87  0.06  4.25

Infections/ 1,000 People

Legend: Bureau of Prisons   United States   China   Italy

[3] Includes the number of BOP inmates who have tested positive for COVID-19, the number of BOP inmates who have recovered, and the number of BOP inmates who have died from COVID-19. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. Compare M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, Response to EDNY Administrative Order 2020-14 (Apr. 7, 2020) at https://www.nyed.uscourts.gov...bop/MDC_20200407_0920S.pdf (3 positive inmates at MDC Brooklyn) with COVID-19 Cases federal Bureau of Prisons (Apr. 7, 2020) at www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn), on a daily basis. The number of federal inmates in BOP-managed institutions, the number of federal inmates in community-based facilities, and the number of federal inmates who have died from COVID-19. Numbers obtained from www.bop.gov/coronavirus on a daily basis.

[4] Numbers obtained on 10/7/2020 at 2... from https://coronavirus.jhu.edu/map.html
[5] Numbers obtained on 10/7/2020 at 2... from https://coronavirus.jhu.edu/map.html
[6] Numbers obtained on 10/7/2020 at 2... from https://www.census.gov/popclock/
[7] Numbers obtained on 10/7/2020 at 2... from https://coronavirus.jhu.edu/map.html
[8] Numbers obtained on 10/7/2020 at 2... from https://www.census.gov/popclock/

ATTACHMENT 4



**U.S. Department of Justice**
Federal Bureau of Prisons
*Federal Correctional Institution*
*P.O. Box 9999, East Arkona Road*
*Milan, Michigan 48160*

April 21, 2020

MEMORANDUM FOR FCI MILAN INMATES

FROM:          Jonathan Hemingway, Warden

SUBJECT:     **Stay In Shelter Phase VI**

As a result in the increase of COVID-19 cases throughout the United States, the BOP is extending a "Stay in Shelter" through May 18, 2020. This is not punitive but rather a nation-wide effort and response to a public health emergency. Effective, Monday, April 13, 2020, the Bureau has extended its movement restrictions to decrease the spread of the virus. This extension – which applies to medical screening, limited inmate gathering, and visitation, will remain in place until May 18, 2020, at which time the action will be reevaluated.

- There are currently 57 inmates that have identified as having COVID-19. The institution modified operations and "Stay in Shelter" is an effort to be proactive.
- All inmates must wear an appropriate face covering when out of cells as social distancing of 6 feet cannot be achieved.
- During this time, you will continue to be given access to medical care, showers, phone and email access in small groups at designated times, on a limited basis. Meals and limited commissary will be delivered to the housing units. Some inmate workers will be needed but it will be on a limited basis.
- We ask that you continue to increase your sanitation and hygiene efforts in the housing unit and in your cells. Staff have increased the sanitation efforts throughout the institution.
- You are encouraged to avoid touching your face, wash your hands frequently with soap and water, in accordance with Centers for Disease and Control and Prevention (CDC) guidance. Practice social distancing whenever practical.
- Please note we are looking at responsible ways to increase out of cell time, and we continue to appreciate the cooperation and flexibility as we do everything we can to assure the safety and security of our staff, inmates, and the general public.

ATTACHMENT 5

AFGE | A BOP Officer Contracted Coronavirus. He Was Told to Return to Work ASAP                    6/30/

ORg - C

*Home (https://www.afge.org/) > Articles (https://www.afge.org/articles/) > A BOP Officer Contracted Coronavirus. He Was Told to Return to Work ASAP (https://www.afge.org/article/a-bop-officer-contracted-coronavirus.-he-was-told-to-return-to-work-asap/)*



# A BOP Officer Contracted Coronavirus. He Was Told to Return to Work ASAP

*May 04, 2020*

28

Categories: <u>BOP (https://www.afge.org/articles/?Category=40)</u>, <u>The Insider (https://www.afge.org/articles/?Category=84)</u>, <u>Coronavirus (https://www.afge.org/articles/?Category=105)</u>

AFGE | A BOP Officer Contracted Coronavirus. He Was Told to Return to Work ASAP

Randy Hall was having dinner with his family on April 3 when he realized he couldn't smell the food. That worried him – the loss of sense of smell is a telltale sign of COVID-19. As a correctional officer, he had been going to work every day at the Federal Correctional Institution, Milan, Mich., throughout the coronavirus outbreak. The state was on a lockdown, so he had no other contact outside the prison. It was possible he had contracted the virus even though he had none of the usual symptoms, like a fever or shortness of breath.

If he had it, he didn't want to endanger his colleagues and inmates, so he called his office and asked to be tested. The request was denied. The Bureau of Prisons only tested inmates, not staff. They also didn't recognize his symptom as a COVID-19 symptom. They wanted him to keep coming to work even though they didn't give him or his colleagues any personal protective equipment.

The only way he could get a test was through his personal doctor. He decided to call in sick. He then called his family doctor and explained that he was a first responder, that he worked inside a prison, that he had come in contact with many people every day.

The doctor wrote a doctor's order for him to take to the county COVID-19 test center. They gave him a test there and called the following day to report that he had indeed been infected.

When he called his office to report the result, though, they didn't seem to worry about the virus. They told him to return to work if he was fever-free for 72 hours, which he was because he never had a fever. Then they told him to return to work seven days after he started feeling the symptoms, which was two days prior. Then they told him to return to work if there was any improvement at all. There was no 14-day quarantine as recommended by the Centers for Disease Control and Prevention.

Since BOP denied workers health and safety leave, Randy had to take sick leave and planned to file for workers' compensation. Because of pressure from the AFGE Council of Prison Locals, however, the agency now allows paid emergency leave under a new COVID-19 response law.

His only symptom the entire time was the loss of sense of smell. But that doesn't mean he couldn't spread the virus. A lot of people who are non-symptomatic unknowingly spread the virus because they don't even know they have it.

So far, 40 inmates and 50 staff members at FCI Milan have tested positive for coronavirus. Two inmates died. A month ago, one of Randy's colleagues helped take care of an inmate who had to be transported from the prison to a hospital. The colleague was not given PPE – he had

requested a mask but was denied. He sat in the ER with the inmate, who later tested positive and died. The colleague contracted the virus and ended up on a ventilator himself.

"With their procedures, they kind of intensified the outbreak inside the prison. One, we didn't have PPE. Two, they didn't recognize my symptoms as COVID-19 symptoms, so they wanted me to come to work," said Randy, who is president of AFGE Local 1741.

## Recent AFGE News:

### Trump Administration Moves to Abolish OPM Despite Law Prohibiting It (/link/12c4983bb01a43fda10c0cf3ee608a90.aspx)

*June 29, 2020*



The Trump administration is working behind the scenes to move forward with its plan to merge OPM with the GSA.

**Read More**
(/link/12c4983bb01a43fda10c0cf3ee608a90.aspx)

(/link/12c4983bb01a43fda10c0cf3ee608a90.aspx)

### 1,000 USDA Employees Being Moved Out of Toxic Building Complex (/link/385c7d6ce6e046edb1b948ef1fb6701f.aspx)

*June 29, 2020*



After a years-long fight, 1,000 employees working for the Department of Agriculture's Rural Development department are being moved out of the contaminated Goodfellow building complex in St. Louis, MO.

**Read More**
(/link/385c7d6ce6e046edb1b948ef1fb6701f.aspx) (/link/385c7d6ce6e046edb1b948ef1fb6701f.aspx)

### Court Rejects FLRA's Attempt to Dismiss AFGE's Lawsuit (/link/d2c58a95848443b483e56cc001814dd4.aspx)

*June 29, 2020*

ATTACHMENT 6

```
MILIX  530.03 *      BUREAU OF PRISONS COUNT SHEET          *    11-02-2020
PAGE 001          *              MILAN FCI                  *    04:34:30
                        QTRG EQ ****   OCTG EQ ****
```

| COUNT AREA | CENSUS | CS OS MA MR IY | FS OV OC D | O O H E R | O T1 T2 H A E R | P R C K | P I A N T | P WO EU RS S | P OH N E S | UR N IW CR OH | VI SG I T | W L D | OC TU UO N T | VERIFY COUNT | COUNT COUNT AREA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A-A | 84 | | FS | | | | Total 4 | | | | | | 4 | _____ | 80 A-A |
| A-B | 92 | | 3 | -5 | -2 | -15 | (158) 3 | 13+3=14 | | | | | 7 | _____ | 85 A-B |
| B-A | 50 | | | | | | | | | | | | | _____ | 50 B-A |
| B-B | 52 | | | -1 | -1 | | (105) | 8+9+4 | | | | | | _____ | 52 B-B |
| B-C | 52 | | 1 | | | | (97) | 5+1+3 | | | | | 1 | _____ | 51 B-C |
| B-D | 45 | | 1 | -5 | | | | | | | | | 1 | _____ | 44 B-D |
| C-A | 0 | | | | | | (41) | 3+5+3 | | | | | | _____ | 0 C-A |
| C-B | 0 | | | -1 | | | | | | | | | | _____ | 0 C-B |
| D-A | 49 | | | | | | | | | | | | | _____ | 49 D-A |
| D-B | 112 | | | | | | | | | | | | | _____ | 112 D-B |
| E-A | 0 | | | | | | (23) | | | | | | | _____ | 0 E-A |
| E-B | 0 | | | -1 | | | | | | | | | | _____ | 0 E-B |
| F-A | 56 | | | | | | (97) | 5+1+5 | | | | | | _____ | 56 F-A |
| F-B | 53 | | 2 | -6 | -1 | | | | | | | | 2 | _____ | 51 F-B |
| F-C | 50 | | 2 | | | | (97) | 5+1+4 | | | | | 2 | _____ | 48 F-C |
| F-D | 58 | | 1 | -5 | -3 | | | | | | | | 1 | _____ | 57 F-D |
| G-A | 69 | | | | | | | | | | | | | _____ | 69 G-A |
| G-B | 87 | | | -5 | | -6 | 3 | 4 | +5 | | | | 7 | _____ | 80 G-B |
| H-A | 93 | | | | | -6 | 9 | | 9 | | | | 9 | _____ | 84 H-A |
| H-B | 93 | | | -6 | -1 | | 3 | 5 | +6 | | | | 8 | _____ | 85 H-B |
| Q-A | 20 | | | | | | | | | | | | | _____ | 20 Q-A |
| Q-B | 20 | | | | | | | | | | | | | _____ | 20 Q-B |
| Q-C | 22 | | | | | | | | | | | | | _____ | 22 Q-C |

ATTACHMENT 7

The U.S. District Court local to FCI Milan and intimately familiar with the ongoing outbreak at FCI Milan and in the local area has continued to grant compassionate release to numerous FCI Milan prisoners. See e.g., (as of September 18 published cases), U.S. v. Owens, 2020 U.S. Dist. LEXIS 165449 (E.D. Mich. Sept. 10, 2020); U.S. v. Edwards, 2020 U.S. Dist. LEXIS 166969 (E.D. Mich. Aug. 17, 2020); Frushour v. U.S., 2020 U.S. Dist. LEXIS 146657 (E.D. Mich. Aug. 14, 2020); U.S. v. Cruz, 2020 U.S. Dist. LEXIS 140229 (E.D. Mich. Aug. 6, 2020); U.S. v. Nazzal, ibid; Snell v. U.S., 2020 U.S. Dist. LEXIS (E.D. Mich. June 2, 2020); U.S. v. White, 2020 U.S. Dist. LEXIS (E.D. Mich. May 20, 2020); U.S. v. Hunt, 2020 U.S. Dist. LEXIS 83124 (E.D. Mich. May 12, 2020); U.S. v. Saad, 2020 U.S. Dist. LEXIS 74949 (E.D. Mich. Apr. 29, 2020); U.S. v. Atwi, 2020 U.S. Dist. LEXIS 68282 (E.D. Mich. Apr. 20, 2020).

ATTACHMENT 8

# CHESS AND SCRABBLE WINNERS

| UNIT | CHESS | SCRABBLE |
|------|-------|----------|
| A-Unit | Harris #62160-019 | West  #4999-050 |
| B-1 | Twyman #52964 | R.Jones #79119-083 |
| B-2 | Robinson #19910-032 | Gibson #50981-039 |
| F-1 | Wray #13005-040 | Lawrence #48650-424 |
| G-Unit | Goins #17356-040 | T.Johnson #08200-030 |
| H-Unit | Applewhite #13755-040 | C.Reibel #09111-025 |

## GET WITH BERGER FOR PRIZE BY AUGUST 26TH 2020

Posted 08/24/2020

J.Berger

Sports Specialist.

HOELTZEL, MARK  56366039

# FCI Milan Unit Spades Tournament

## Sign up for a Unit Spades tournament.



Sign up for the Unit Spades tournament.  All participants must sign up below. The winner of each Unit will be awarded a case of soda. The participant names must be filled out and completed legibly below. All Signup sheets with winner will be collected on September27th before noon.

| Name | Reg# | Name | Reg# |
|------|------|------|------|
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |

Posted 9/2/2020

Sports Specialist J. Berger



## FCI Milan Unit Pinochle Tournament

# Sign up for the Unit Pinochle tournament.



Sign up for the Unit Pinochle tournament.  All participants must sign up below. The winner of each Unit will be awarded a case of soda. The participant names must be filled out and completed legibly below. All Signup sheets with winner will be collected on September 27th before noon.

| Name | Reg# | Name | Reg# |
|------|------|------|------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Posted 09/02/2020

Sports Specialist J. Berger

# DOMINOES, SPADES AND PINOCHLE WINNER

| DOMINOES | PINOCHLE | SPADES |
|---|---|---|
| Vang #15254-089 | Flaco # 40509-013 | Vang #15854-089 |
| Jones #49837-039 | Vang #15854-089 | Vareira #40509-013 |
| Carter #17032-039 | Mcryniods #55522-039 | Franks #13181-030 |
| Pickens #66401-060 | Dawoon #13533-067 | Anderson #66581-060 |
| Payne #56658-039 | Blaskis #71557-067 | Reed #66790-060 |
| Bennett #16972-027 | Tennison #29048-031 | Hicks #47795-044 |
| Dunbar #55818-039 | Veatch #01973-068 | Jackson # 10272-028 |
| Tennison #29048-031 | Gonzalez #11530-027 | Harris #14151-028 |
| Young #14961-026 | Pittman #15504-026 | Gonzales #11530-027 |
| Suttles #15400-040 | Bofastowski #13900-026 | Tankson #45652-424 |
| Reed #66009-060 | Kocik #51579-039 | Peitier #11777-040 |
| Watkins #44929-039 | Turner 22489-424 | Love #16888-089 |
| Beaton #70925-061 | Hamet #16997-027 | Daniel #60644-060 |
| | | Murray #13612-027 |

## GET WITH BERGER ONLY FOR PRIZE BY OCTOBER 9TH 2020. YOU MUST PRESENT ID CARD

Posted 08/24/2020

J.Berger

Sports Specialist.

ATTACHMENT 9

## MALE PATTERN RISK SCORING

| Register Number: | 56366-039 | | Date: | 8/11/2020 | |
|---|---|---|---|---|---|
| Inmate Name: | Hoeltzel, Mark Franlin | | | | |

| MALE RISK ITEM SCORING | CATEGORY | GENERAL SCORE | Enter Score | VIOLENT SCORE | Enter Score |
|---|---|---|---|---|---|
| 1. Current Age | > 60 | 0 | | 0 | |
| | 51-60 | 7 | | 4 | |
| Click on gray dropdown box to select, then click on dropdown arrow | 41-50 | 14 | 14 | 8 | 8 |
| | 30-40 | 21 | | 12 | |
| | 26-29 | 28 | | 16 | |
| | < 26 | 35 | | 20 | |
| 2. Walsh w/Conviction | No | 0 | 1 | 0 | 0 |
| | Yes | 1 | | 0 | |
| 3. Violent Offense (PATTERN) | No | 0 | 5 | 0 | 5 |
| | Yes | 5 | | 5 | |
| 4. Criminal History Points | 0 - 1 Points | 0 | | 0 | |
| | 2 - 3 Points | 8 | | 4 | |
| | 4 - 6 Points | 16 | 0 | 8 | 0 |
| | 7 - 9 Points | 24 | | 12 | |
| | 10 - 12 Points | 32 | | 16 | |
| | > 12 Points | 40 | | 20 | |
| 5. History of Escapes | None | 0 | | 0 | |
| | > 10 Years Minor | 2 | 0 | 1 | 0 |
| | 5 - 10 Years Minor | 4 | | 2 | |
| | < 5 Years Minor/Any Serious | 6 | | 3 | |
| 6. History of Violence | None | 0 | | 0 | |
| | > 10 Years Minor | 1 | | 1 | |
| | > 15 Years Serious | 2 | | 2 | |
| | 5 - 10 Years Minor | 3 | | 3 | |
| | 10 - 15 Years Serious | 4 | 0 | 4 | 0 |
| | < 5 Years Minor | 5 | | 5 | |
| | 5 - 10 Years Serious | 6 | | 6 | |
| | < 5 Years Serious | 7 | | 7 | |
| 7. Education Score | Not Enrolled | 0 | | 0 | |
| | Enrolled in GED | -2 | -4 | -1 | -2 |
| | HS Degree / GED | -4 | | -2 | |
| 8. Drug Program Status | No DAP Completed | 0 | | 0 | |
| | NRDAP Complete | -3 | | -1 | |
| | RDAP Complete | -6 | 0 | -2 | 0 |
| | No Need | -9 | | -3 | |
| 9. All Incident Reports (120 months) | 0 | 0 | | 0 | |
| | 1 | 1 | | 1 | |
| | 2 | 2 | 0 | 2 | 0 |
| | > 2 | 3 | | 3 | |
| 10. Serious Incident Reports (120 months) | 0 | 0 | | 0 | |
| | 1 | 2 | | 2 | |
| | 2 | 4 | 0 | 4 | 0 |
| | > 2 | 6 | | 6 | |
| 11. Time Since Last Incident Report | 12+ months or no incidents | 0 | | 0 | |
| | 7-12 months | 2 | | 1 | |
| | 3-6 months | 4 | 0 | 2 | 0 |
| | <3 | 6 | | 3 | |
| 12. Time Since Last Serious Incident Report | 12+ months or no incidents | 0 | | 0 | |
| | 7-12 months | 1 | | 2 | |
| | 3-6 months | 2 | 0 | 4 | 0 |
| | <3 | 3 | | 6 | |
| 13. FRP Refuse | NO | 0 | 0 | 0 | 0 |
| | YES | 1 | | 1 | |
| 14. Programs Completed | 0 | 0 | | 0 | |
| | 1 | -2 | | -1 | |
| | 2 - 3 | -4 | -2 | -2 | -1 |
| | 4 - 10 | -6 | | -3 | |
| | > 10 | -8 | | -4 | |
| 15. Work Programs | 0 Programs | 0 | | 0 | |
| | 1 Program | -1 | -1 | -1 | -1 |
| | >1 Program | -2 | | -2 | |
| Total Score (Sum of Columns) | | General: | 13 | Violent: | 9 |
| General/Violent Risk Levels | | General: | Low | Violent: | Minimum |
| OVERALL MALE PATTERN RISK LEVEL | | | | | Low |

ATTACHMENT 10

```
MILBP                    *           INMATE EDUCATION DATA        *        11-20-2020
PAGE 001 OF 001 *                       TRANSCRIPT               *        10:29:33

REGISTER NO: 56366-039           NAME..: HOELTZEL                     FUNC: PRT
FORMAT....: TRANSCRIPT           RSP OF: MIL-MILAN FCI

-------------- EDUCATION INFORMATION --------------
FACL ASSIGNMENT DESCRIPTION                       START DATE/TIME   STOP DATE/TIME
MIL  ESL HAS    ENGLISH PROFICIENT                02-06-2019 1336   CURRENT
MIL  GED HAS    COMPLETED GED OR HS DIPLOMA       02-06-2019 1337   CURRENT

-------------- EDUCATION COURSES --------------
SUB-FACL  DESCRIPTION                      START DATE   STOP DATE  EVNT AC LV  HRS
MIL       SCIENCE OF ENERGY (IS)          08-18-2020   CURRENT
MIL       RPP3 UNDERSTANDING INVEST (IS)  03-26-2020   08-05-2020  P  C  P   12
MIL       SCIENCE NATURAL HEAL (IS)       03-06-2020   03-26-2020  P  C  P   12
MIL       STRESS AND YOUR BODY (IS)       12-16-2019   03-06-2020  P  C  P   12
MIL       RPP6 THE ADDICTIVE BRAIN (IS)   09-16-2019   12-16-2019  P  C  P    6
MIL       RPP6 OUR NIGHT SKY (IS)         08-05-2019   09-10-2019  P  C  P    6
MIL       RPP2 PARENTING CLASS            04-09-2019   06-14-2019  P  C  P   20
MIL       RPP6 GREETING CARD T.B.A.       05-04-2019   05-27-2019  P  C  P   16
MIL       RPP6 WORLD NEVER THE SAME (IS)  02-28-2019   04-01-2019  P  C  P   18
```

<u>ATTACHMENT 11</u>

## CHILD PORNOGRAPHY OFFENDERS GRANTED COMPASSIONATE RELEASE

| Defendant | LEXIS# | 2020 Date | District Court | Judge |
|---|---|---|---|---|
| Greenhut | 98568 | June 3 | C.D. Cal. | Snyder |
| Pagliuca | 86932 | May 18 | S.D.N.Y. | Seibel |
| Amaro | 123626 | July 14 | S.D.N.Y. | Failla |
| Lockhart | 135021 | July 27 | E.D.N.Y. | Johnson |
| McFadden | 129103 | July 22 | S.D.N.Y. | Kaplan |
| Sawicz | 64418 | Apr. 10 | E.D.N.Y. | Ross |
| Pippin | 88899 | May 20 | W.D. Wash. | Coughenour |
| Delateur | 115551 | July 1 | W.D. Wash. | Settle |
| Grubbs | 119915 | July 8 | W.D. Wash. | Zilly |
| Brandrow | 127031 | July 20 | E.D. Mich. | Leitman |
| Asher | 111205 | June 15 | N.D. Ga. | Cohen |
| Hanson | 116613 | July 2 | D. Ore. | Aiken |
| Stone | 109434 | June 23 | W.D. Ark. | Holmes |
| Riccardi | 131085 | July 24 | D. Kan. | Lungstrum |
| Kamps | 83268 | May 12 | E.D. Wis. | Griesbach |
| Kirschner | 124496 | July 15 | S.D. Ind. | Hanlon |
| Jenner | 113205 | June 29 | D. Nev. | Jones |
| Moit | 113710 | June 29 | N.D. Ind. | Simon |
| Feucht | 95104 | May 27 | S.D. Fla. | Middlebrooks |
| Watson | 130483 | July 22 | D. Nev. | Du |
| Dunn | 135207 | July 30 | M.D. Ala. | Thompson |
| Dillard | 90865 | Apr. 27 | D. Idaho | Bastion |
| Yellin | 112786 | June 26 | S.D. Cal. | Moskowitz |
| Fischman | 78157 | May 1 | N.D. Cal. | Gilliam |
| Connell | 81642 | May 8 | N.D. Cal. | Seeborg |
| Sholler | 86084 | May 15 | N.D. Cal. | Illston |
| Frushour | 146657 | Aug. 13 | E.D. Mich. | Tarnow |
| Axsom | 147274 | July 28 | E.D. Ark. | Marshall |
| Breslin | 143751 | Aug. 10 | N.D. Cal. | Rogers |
| Minsal | 142198 | Aug. 5 | S.D. Fla. | Ungaro |
| Blake | 144632 | Aug. 12 | S.D. Fla. | Bloom |
| Godlewski | 187617 | Sept 11 | E.D. Mich | Tarnow |
| Telson | 181523 | Sept 21 | S.D. Fla | Middlebrooks |
| Lunstrom | 174712 | Sept 23 | D. Ore. | McShane |

RELEASED CHILD SEX OFFENDERS CONTINUED

| Defendant | LEXIS# | 2020 Date | District Court | Judge |
|-----------|--------|-----------|----------------|-------|
| Graver | 192556 | Sept 29 | S.D. Iowa | ? |
| Brown | 187821 | Oct 9 | E.D. Mich. | Tarnow |

ATTACHMENT 12

## TABLE OF FEDERAL 2422(b) OFFENDERS
### with available sentence data

| Defendant | LEXIS# | Year | District | Months | Traveled | Raped | convicted #of other charges |
|-----------|--------|------|----------|--------|----------|-------|-----------------------------|
| Dobrowolski |        | 2010 | 6th Cir.   | 120 | Y   |     | 1 |
| Davis       | 76188  | 2011 | E.D. Mich. | 120 | Y   | Y   |   |
| Maxwell     | 36540  | 2016 | N.D. Ala.  | 120 | Y   |     |   |
| Paulson     | 114738 | 2016 | S.D. Fla.  | 120 | Y   |     |   |
| Melton      |        | 2018 | 5th Cir.   | 120 | Y   |     |   |
| Taylor      |        | 2017 | 5th Cir.   | 120 | Y   |     |   |
| Ruiz        |        | 2017 | 11th Cir.  | 120 | Y   |     |   |
| Sumner      |        | 2013 | 11th Cir.  | 120 | Y   |     |   |
| Rivena      |        | 2010 | 11th Cir.  | 120 | Y   |     |   |
| Jockisch    | 87815  | 2019 | S.D. Ala.  | 120 | Y   |     |   |
| Riggs       | 73797  | 2018 | N.D. Ala.  | 120 | Y   |     | 1 |
| Rutgerson   | 118164 | 2018 | S.D. Fla.  | 120 | Y   |     |   |
| Strubberg   |        | 2018 | 8th Cir.   | 120 | Y   |     |   |
| Clark       | 229496 | 2019 | E.D. Tex.  | 120 | Y   |     | 10 y/o victim |
| Michelletti | 96180  | 2016 | N.D. Miss. | 120 | Y   |     |   |
| Kennedy     | 154271 | 2013 | W.D.N.C.   | 120 | Y   |     | brought gun |
| Wilke       |        | 2012 | 2d Cir.    | 120 | Y   |     | 2 |
| Johnson     |        | 2000 | 2d Cir.    | 88  | Yx5 | Yx2 | 9 |
| Frazier     | 124602 | 2020 | S.D.Ill.   | 120 | Y   |     | 1 |
| Johnson     | 149044 | 2020 | W.D.N.C.   | 120 | Y   |     |   |
| Malek       | 169434 | 2020 | M.D. Fla   | 120 | Y   |     |   |
| Siegert     | 148471 | 2020 | S.D. Fla.  | 120 |     |     |   |
| Martin      | 135567 | 2020 | W.D.N.Y.   | 120 | Y   | Y   |   |
| Mink        | 163033 | 2020 | W.D. Ark.  | 120 | Y   |     |   |
| Osborne     | 160631 | 2011 | S.D. Fla.  | 120 | Y   |     |   |
| Rhode       | 77259  | 2010 | M.D. Fla.  | 60  | Y   |     |   |
| Burbank     | 102635 | 2010 | M.D. Ala.  | 120 | Y   |     | 1 |
| Muentes     | 125937 | 2010 | S.D. Fla.  | 120 | Y   |     | 1 |
| Curtin      |        | 2009 | 9th Cir.   | 60  | Y   |     | 1 |
| Kozlowski   |        | 2007 | 9th Cir.   | 60  | Y   |     | 1 |
| Hold        |        | 2007 | 9th Cir.   | 60  | Y   |     | 1 |
| Schlake     |        | 2006 | 9th Cir.   | 60  | ?   |     |   |
| Dhingra     |        | 2004 | 9th Cir.   | 24  | Y   | Y   | repeat SO |
| Hughes      |        | 2010 | 6th Cir.   | 120 | Y   |     |   |
| Dobrowolski |        | 2010 | 6th Cir.   | 120 | Y   |     | 1 |

| Defendant | LEXIS # | Year | District | Months | Traveled | Raped | #other convictions |
|---|---|---|---|---|---|---|---|
| Chriswell | | 2004 | 6th Cir. | 60 | Y | | 1 |
| Leach | | 2007 | 8th Cir. | 72 | Y | | |
| Mumpower | | 2010 | 10th Cir. | 60 | Y | | |
| Munro | | 2005 | 10th Cir. | 120 | Y | | 924(c) |
| Sims | | 2005 | 10th Cir. | 37 | Y | | 1 |
| Thomas | | 2005 | 10th Cir. | 70 | Y | | 1 |
| Pearl | | 2003 | 10th Cir. | 97 | Y | | 4 |
| Johnson | | 1999 | 10th Cir. | 27 | Y | Y | 1 |
| Byrne | | 1999 | 10th Cir. | 21 | Y | Y | 1 |
| Forrester | | 2009 | 11th Cir. | 108 | Y | | 7 y/o victim |
| Bolen | | 2005 | 11th Cir. | 110 | Y | | 3 y/o victim |
| Haynes | | 2005 | 11th Cir. | 78 | Y | | brought gun |
| Murrell | | 2004 | 11th Cir. | 33 | Y | | |
| Panfil | | 2003 | 11th Cir. | 33 | Y | | |
| Root | | 2002 | 11th Cir. | 40 | Y | | 1 |
| Ness | 78108 | 2009 | D.N.J. | 60 | Y | | |
| McDarrah | | 2009 | 2d Cir. | 72 | Y | | |
| Joseph | | 2008 | 2d Cir. | 97 | Y | | |
| Gagliandi | | 2007 | 2d Cir. | 60 | Y | | |
| Brand | | 2006 | 2d Cir. | 60 | Y | | |
| Cernik | 50462 | 2008 | E.D.Mich. | 120 | Y | | |
| Chilleme | 25920 | 2006 | N.D. Ohio | 60 | Y | | 1 |
| Montgomery | 35992 | 2010 | N.D. Okla | 120 | Y | | |
| Nestor | | 2009 | 3d Cir. | 120 | Y | | 1 |
| Mizwa | | 2009 | 3d Cir. | 60 | Y | | |
| Chaudry | | 2009 | 3d Cir. | 84 | Y | | 1 |
| Yaniro | | 2008 | 3d Cir. | 57 | Y | | 1 |
| Garcia | | 2007 | 3d Cir. | 83 | Y | | 1 |
| Tykarsky | | 2006 | 3d Cir. | 60 | Y | | vacated |
| Kaye | | 2007 | 4th Cir. | 78 | Y | | 1 |
| Crutchley | 141604 | 2009 | S.D.Fla. | 120 | Y | | |

ATTACHMENT 13

TRULINCS  56366039 - HOELTZEL, MARK FRANLIN - Unit: MIL-F-D

---------------------------------------------------------------------------------------------------------

FROM: 56366039
TO: AW Operations
SUBJECT: ***Request to Staff*** HOELTZEL, MARK, Reg# 56366039, MIL-F-D
DATE: 11/11/2020 03:59:28 PM

To:
Inmate Work Assignment: library

I'm writing to document the repeated derogatory use of the term "Cho-Mo" by Correctional Officer Drumit(?)... name and spelling are uncertain as she displayed no name on her vest. She was the day-shift officer (6-2) here in F2 today (short, caucasion female, possibly blond). She was describing her impressions of the various housing units here at Milan with several inmates as follows:

Drumit: compared the different inner units to different neighborhoods in Chicago, concluding with, "and those units out there, they're like the Bahamas or something."

Inmate: "Yah, there are a lot of cho-mo's in the outside units"

Drumit: <laughs> "Yah, it's like 'cho-mo alley' out there."

<All laugh.>

Drumit: "That's why I don't socialize nearly as much out there cuz of all the fucking cho-mo's."

<More laughter and agreement.>

As you know, "Cho-Mo" is prison slang for "child molester," and is used as a derogatory term for all sex offenders, even though the vast majority of federal sex offenders are not child molesters. FCI-Milan continues to perpetuate an anti-sex offender culture that threatens the safety and security of this group of inmates, and thus the institution as a whole. This atmosphere is exemplified by the recent serial sexual extortion of sex offenders in B-1 Unit, and the more recent bullying and theft from sex offenders in H-Unit. Language like that of Officer Drumit reinforces and perpetuates that culture and is not just unprofessional, it is unacceptable. It's one thing to hear it from fellow inmates, but when the label is also used in a derogatory fashion by prison staff, it validates the continued aggression against sex offenders at FCI-Milan, and gives them the impression that CO's will look the other way when sex offenders are abused (verbally, emotionally, physically, and sexually) by other inmates.

I hope that this behavior by Milan prison staff will be taken seriously.
thank you,
Mark Hoeltzel

ATTACHMENT 14

TRULINCS  56366039 - HOELTZEL, MARK FRANLIN - Unit: MIL-F-D

----------------------------------------------------------------------------------------

FROM: 56366039
TO: Medical Services
SUBJECT: ***Request to Staff*** HOELTZEL, MARK, Reg# 56366039, MIL-F-D
DATE: 10/18/2020 09:57:59 AM

To: Mr. Roper
Inmate Work Assignment: library

Hi Mr. Roper,
Please add my name to the list of inmates who would like a copy of their medical records for court.
thanks,
mark hoeltzel

Federal Correctional Institution
P.O. Box 1000
Milan, MI. 48160



Metroplex MI 480
TUE 24 NOV 2020

11/24/20

⇔56366-039⇔
Clerk Of The
U.S. District Court
231 W Lafayette BLVD
Fifth Floor
Detroit, MI 48226
United States



RECEIVED
DEC - 3 2020
CLERK'S OFFICE
U.S. DISTRICT COURT