THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

---

United States of America,

      Plaintiff-Respondent,

                          Case No. 18-cr-20111

v.

                          Hon. Arthur Tarnow

Mark Franklin Hoeltzel,

      Defendant-Movant.

_____/

## MOTION FOR REDUCTION IN SENTENCE
## PURSUANT TO 18 U.S.C. §3582

COMES NOW Mark Hoeltzel, pro se Movant/Defendant, and moves this Court to reduce his sentence pursuant to 18 USC § 3582 due to the extraordinary and compelling circumstances that have developed since his sentence by this Court.

### INTRODUCTION

Mr. Hoeltzel previously moved this Court for Compassionate Release, arguing that his health conditions combined with the COVID-19 pandemic constituted extraordinary and compelling reasons for immediate release to his Michigan Department of Corrections detainer. However, this Court rightfully denied Mr. Hoeltzel's motion because Mr. Hoeltzel could not show that he would be at less risk from COVID-19 in the Michigan Department of Corrections than he was in the Federal Bureau of Prisons.

Today, Mr. Hoeltzel moves this Court to reduce his sentence due to the extraordinary and compelling circumstances that have developed since his sentence was imposed by this Court on December 13, 2018. Since that date, the COVID-19 pandemic, the finalization of his state sentence, and the BOP's inability to protect him from physical violence have all combined to make Mr. Hoeltzel's original 120 month sentence

far more punitive than this Court intended and otherwise "greater than necessary" to fulfill the purposes of sentencing. Specifically, the following conditions have combined to constitute extraordinary and compelling reasons warranting a sentence reduction:

1. COVID-19 pandemic, resulting in,
   a) more punitive conditions of incarceration,
   b) inability to perform necessary self-care in a prison environment,
   c) lack of adequate medical care, and
   d) lack of rehabilitative opportunities.

2. Finalization of state sentence, resulting in,
   a) disqualification from early release from First Step Act Time Credits,
   b) disqualification from alcohol abuse treatment,
   c) disqualification from halfway house placement, and
   d) a worsening of the collateral consequences of conviction.

3. Mr. Hoeltzel having been physically assaulted by other inmates, resulting in,
   a) physical injury and pain, and
   b) mental anguish and psychological stress.

## LEGAL STANDARDS

Prior to the First Step Act of 2018, "extraordinary and compelling reasons" for reduction in sentence could only be defined by the "applicable" Sentencing Commission Policy Statement, and subsequent to the USSG policy statement within § 1B1.13, the Director of the Bureau of Prisons. However, since the First Step Act's passage, the majority of circuit courts have recognized that the policy statement in § 1B1.13 is no longer "applicable," and, as the Sixth Circuit has opined, actually "contravenes Congress's motivation for reforming compassionate release in the First Step Act." United States v. Jones, 980 F.3d 1098, 1111 (6th Cir. 2020). Thus, district

courts have discretion to define 'extraordinary and compelling' on their own initiative" for inmate-filed compassionate release motions. United States v. Elias, 984 F.3d 516, 519-20 (6th Cir. 2021).

More recently, the Sixth Circuit cabined this newly established district court discretion by holding that "facts that existed when the defendant was sentence cannot later be construed as 'extraordinary and compelling' justifications for a sentence reduction." United States v. Hunter, 12 F.4th 555, 562 (6th Cir. 2021).

Thus, this Court can and should consider any and all facts that did not exist at the time of Mr. Hoeltzel's sentencing to determine if extraordinary and compelling reasons warrant the requested reduction in sentence.

Moreover, Mr. Hoeltzel is not requesting compassionate release. Indeed he is requesting that this Court reduce his sentence by 12-36 months, an action that is well within this Court's authority under § 3582. When "immediate release is inappropriate, however, '[i]t bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions.'" "Under § 3582(c)(1)(A), '[a] district court [can], for instance, reduce but not eliminate a defendant's prison sentence.'" United States v. Wingate, 2021 U.S. Dist. LEXIS 137482 at *23 (E.D. Mich. 2021) (Tarnow, A) (quoting United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020) (court granted defendant's § 3582 motion in part by reducing defendant's sentence, but not granting immediate release).

ARGUMENTS

## I. THE COVID-19 PANDEMIC HAS RESULTED IN EXTRAORDINARY COMPELLING REASONS WARRANTING SENTENCE REDUCTION

### 1. Prison restrictions in response to the COVID-19 have resulted in harsher and more punitive conditions of incarceration than this Court intended or anticipated at Mr. Hoeltzel's sentencing.

Mr. Hoeltzel has been incarcerated under varying degrees of lockdown for over 24 months since the BOP first instituted measures to attempt to control the spread of COVID-19. This has included months locked in his cell, when, at its worst during the most recent viral surge in January 2022 (Omicron variant), he was only allowed out for 5 minutes a day during 2 days out of the week. While his cell has a sink and a toilet, this restricted any access to contact with the outside world (most painfully his family), showers, exercise, clean laundry, warm meals, and social contact, let alone rehabiliatation opportunities. Mr. Hoeltzel was unable to receive visits from his young children for over a year despite the fact that they lived less than 15 minutes from the prison. To this day, their visits are restricted to one hour, and he still cannot hug them as he could before the pandemic.

These conditions exacerbated Mr. Hoeltzel's depression and anxiety, and he continues to live with the fear that he will contract COVID-19 for a third time. His first bout with COVID-19 left him with permanent visual loss in his right eye. He fears what the next bout might bring.

District courts from coast to coast have recognized this increase in the punitive nature of incarceration as a primary or contributing extraordinary and compelling reason to warranting sentence reduction. See, e.g., United States v. Robles, 2021 U.S. Dist. LEXIS 150046, at 20-21 (S.D.N.Y. 2021):

> [T]he COVID-19 pandemic has made [Defendant]'s imprisonment far more grueling than Congress, or [sentencing] Judge Sweet, had reason to anticipate. As courts have widely recognized in granting compassionate release motions since March 2020, the unexpected rigors of incarceration during the pandemic present "extraordinary and compelling" reasons that justify a sentence reduction under § 3582(c)(1)(A).
>
> [...]
>
> In particular, the pandemic has subjected all inmates to far more restrictive conditions of confinement than normal incarceration. It has limited inmates' access to visitors such as family, to counsel, and to rehabilitative, therapeutic, and recreational programs. And it has given rise to fears of infection and worse by inmates. In these respects, the pandemic has spawned

-4-

> conditions of confinement far more punishing than what could
> have been expected at the time of [Defendant]'s sentencing.

(reducing defendant's sentence); see also, United States v. Romero, 2021 U.S.

Dist. LEXIS 73877, at *8-9 (S.D.N.Y. 2021):

> [A]s of today, [Defendant] has served 13 months in prison in the
> challenging and no doubt harrowing conditions presented by
> COVID-19... Under these circumstances, it is easy to conclude that
> exceptional circumstances justify [Defendant]'s release. The pandemic
> has subjected [Defendant] to far more restrictive conditions of
> confinement, and has prompted limits on access to visitors,
> including family, far beyond what the Court expected at sentencing.
> The virus's wide incursion into the facility in which [Defendant]
> is held has also assuredly made the past 13 months at [his prison]
> especially fearful and fraught. Both in imposing sentences during
> the pandemic and in considering applications for compassionate
> release, this Court has repeatedly recognized that a day in
> prison custody in exceptionally arduous conditions is properly
> viewed as equivalent to more than a day in ordinary custody.

(reducing defendant's sentence by 4 months based solely on the increased punitive

conditions of incarceration during the pandemic); see also United States v. McGee,

2021 U.S. Dist. LEXIS 83734, at *4-5 (N.D. Cal. 2021) (granting sentence reduction

while noting "that the sentencing factor relating to the 'need for just punishment'

has dramatically shifted since sentencing, because the lock-down measures prisons

across the country... have undergone to mitigate the spread of the pandemic have

made confinement much more punitive than was contemplated at sentencing").

This Court has agreed while granting sentence reductions. See e.g., United

States v. Sherrod, 2021 U.S. Dist. LEXIS 147643, at *6-7 (E.D. Mich. 2021) (Tarnow, A):

> [Defendant] was warehoused at FCI Milan without access to the
> programs in which the Court intended him to participate and
> was subject to far more restrictive conditions of confinement
> than would normally have been the case. See, e.g., United
> States v. McRae, 2021 U.S. Dist. LEXIS 8777, at *12 (S.D.N.Y.
> Jan. 15, 2021) (noting that "a day spent in prison under extreme
> lockdown and in well-founded fear of contracting a once-in-a-
> century deadly virus exacts a price on a prisoner beyond that
> imposed by an ordinary day in prison"); see also Keri Blakinger,
> What Happens When More than 300,000 Prisoners Are Locked Down,
> Marshall Project (Apr. 15, 2020) ("Experts say the widespread
> use of such restrictions is extraordinary, in scale and length...

> Studies show long-term social isolation comes with a higher
> chance of dying prematurely, in part because of the physical
> effects of stress.").

(granting a 60 month sentence reduction); <u>United States v. Browning</u>, 2021 U.S. Dist.

LEXIS 38058, at *16 (E.D. Mich. 2021) (Tarnow, A):

> [A]lthough [Defendant] has served only a fraction of his sentence,
> the Court notes that his imprisonment has been exceptionally
> restrictive... In short, the nearly two years during which
> [Defendant] has been imprisoned have been unusually burdensome,
> and accordingly, harsher punishment [due to pandemic restrictions]
> than is normally the case.

(granting 72 month sentence reduction).

These harsh conditions of confinement have also resulted in reduced sentences

on the front end (at sentencing). See, e.g., <u>United States v. Marmolejos</u>, No. 19

Cr. 626 (PAE), Dkt. 25 at 32-33 (S.D.N.Y. Nov. 24, 2020) (granting a sentence "farther

below the guidelines sentence it otherwise would have been on account of the conditions

in which [the defendant had] been held  due to COVID-19," where "a day spent in

terribly substandard prison conditions [created as a result of the pandemic]...

exacts more punishment for an incarcerated defendant than a day in ordinary conditions");

<u>United States v. Rivas</u>, No. 19 Cr. 529, Dkt. 46 at 24 ("The [pandemic] has resulted

in extreme lockdowns within [jails], on restrictions on family visits and contact...

The fact that the past eight months of [defendant's] custody has been in trying and

harrowing conditions... is a reason to impose, all things being equal, a lower

sentence than otherwise."); <u>United States v. Ellison</u>, No. 18 Cr. 834, Dkt. 582

at 80-81 ("In reflecting on just sentence, I am mindful... [that the prison] conditions

[] have made the experience of being incarcerated in jail much harder and more

scary than could ever have been anticipated or intended... [T]he sentence I impose

today will be below the sentence I otherwise would have imposed... in recognition

of the rigors you have faced in prison since [the start of the pandemic]."); <u>United

States v. Ramirez</u>, No. 20 Cr. 29, Dkt. 19 at 8-12 (S.D.N.Y. 2020) (explaining that

"the nature of [the defendant's] detention during this pandemic has been really harsh... and, frankly, I think that makes it probably twice as punitive as it otherwise would be.").

In most cases, the increased punitive nature of incarceration was found to be a contributing factor supporting reduction in sentence (see EXHIBIT A, collection of cases in which the increased punitive nature of incarceration due to the pandemic was specifically cited by the court in granting sentence reductions). However, the increased punitive nature of incarceration during the pandemic was found to be the primary, and sometimes only, extraordinary and compelling reason for granting sentence reduction in many cases. See for example, United States v. Henareh, 2021 U.S. Dist. LEXIS 6855, at *15 (S.D.N.Y. 2021) ("[T]he Court does not find that a risk of imminent illness or death constitutes extraordinary and compelling circumstances. Rather, as noted, the Court finds that the unexpectedly harsh punishment to which [Defendant] has been subjected [due to pandemic restrictions] and his family's need for his support constitute extraordinary and compelling circumstances warranting a partial reduction in [Defendant's] sentence [of 12 months]"); United States v. Lillemoe, 2021 U.S. Dist. LEXIS 76170 (D. Conn. 2021) (The increased punitive nature of incarceration due to pandemic restrictions was the only extraordinary and compelling reason found in granting a sentence reduction); United States v. Romero, 2021 U.S. Dist. LEXIS 73877, at *7-8 (S.D.N.Y. 2021):

> It is factually disputed whether he is today more vulnerable to COVID-19 than other inmates. His medical records at the time of his previous application did not so show. And [Defendant]'s claim that he today has become obese, while possibly true, has not been corroborated.
>
> However, the Court's judgment is that [Defendant]'s renewed application for release is meritorious for a different reason... as of today, he has served 13 months in prison in the challenging and no doubt harrowing conditions presented by COVID-19... Under these circumstances, it is easy to conclude that exceptional circumstances justify [Defendant]'s release.

(granted reduction in sentence from 78 to 69 months); United States v. Newell, 2021
U.S. Dist. LEXIS 143059, at *17-18 (M.D.N.C. 2021) (granting a sentence reduction
from 181 to 172 months, reasoning, "While he remains at risk of a second bout with
the virus, that risk is not imminent. Given the vaccination program and the current
low numbers pf positive cases [] at the moment, the situation seems to be improving."
However, "[a]s previously noted, [Defendant]'s experience in prison over the last
year has been 'a qualitatively different type of punishment' than it would have been
without the pandemic"); United States v. Foozailov, 2021 U.S. Dist. LEXIS 89890,
(S.D.N.Y. 2021) (granted sentence reduction from 66 to 44 months, concluding that
health risk was no longer significant because of vaccination, but that harsh pandemic
prison conditions and lack of medical care constituted extraordinary and compelling
reasons); United States v. Cardenas, 2021 U.S. Dist. LEXIS 158897 (S.D.N.Y. 2021)
(in reducing sentence by 12 months, the Court concluded that harsh pandemic conditions
"are extraordinary and compelling," and granted reduction on this reason alone);
United States v. Hatcher, 2021 U.S. Dist. LEXIS 74760 (S.D.N.Y. 2021) (Court granted
an almost 26 month sentence reduction based only on circumstances that have resulted
from the pandemic's impact on her incarceration, and not her health risk); See also
United States v. Robles, 2021 U.S. Dist. LEXIS 150046, at *23 (S.D.N.Y. 2021):

> The Court has also granted compassionate release to inmates without
> serious health conditions who were near the end of their sentence
> based on the unforeseen grueling conditions of confinement presented
> by COVID-19 and the additional punishment suffered as a result.

(citing United States v. Lizardi, 2020 U.S. Dist. LEXIS 188147 ("granting early release
for a defendant with no heightened medical vulnerability to COVID-19 who had served
93 months of a 121 month sentence); also Romero , supra).

## 2. The COVID-19 pandemic has resulted in a significant dearth of rehabilitation opportunites for Mr. Hoeltzel.

Mr. Hoeltzel understands that a combination of personal accountability, treatment, and rehabilitation are critical to his successful return to his community and family. This is evidenced by the fact that he was participating in Residential Sex Addiction Treatment in Pennsylvania at the time of his indictment. Additionally, Mr. Hoeltzel continued intensive outpatient treatment and therapy throughout his 11 months on pre-trial release, including voluntary group and individual treatment, court-ordered group and individual treatment, and multiple 12-step groups. That all ended the day he turned himself over to the custody and care of the BOP. In fact, this Court expressed concern that Mr. Hoeltzel's rehabilitative opportunities would be significantly reduced by incarceration. While the Court's sentencing prediction turned out to be correct, the Court could not anticipate the fact that an unforeseen pandemic would virtually halt rehabilitation programs in prison.

Mr. Hoeltzel's most obvious rehabilitation need is sex offender treatment. Mr. Hoeltzel requested this Court's recommendation that he be designated to FCI-Elkton where sex offender treatment was available. Instead, the BOP designated Mr. Hoeltzel to FCI-Milan, his current institution, which at the time offered no therapy or treatment for sex offenders, but was only minutes away from his young children. Mr. Hoeltzel initially declined the BOP's offer of sex offender treatment because he understood that it would require a transfer much farther from his children, and he and his ex-wife wanted to wait for a year or so to improve the kids' ability to adapt to their father's absense with frequent visits.

Subsequently, Mr. Hoeltzel signed up for NR-SOTP, but was then told that it would likely be many years before he could take the program. He asked if their was any resources available for sex offenders at FCI-Milan and was referred to the psychology "self-help" program, which included two books for sex offender

inmates. At the end of each section in both workbooks, the authors recommend to discuss the exercise with your therapist. The FCI-Milan psychologists were unavailable to help, despite Mr. Hoeltzel's request. Nonetheless, he completed each workbook. EXHIBIT B.

With the advent of the First Step Act, the BOP created a new program for sex offender inmates called Sexual Self-Regulation. Upon reading the BOP's description that this program was "available at all institutions," Mr. Hoeltzel contacted FCI-Milan Director of Psychology to sign-up, but was told that the program was not available at FCI-Milan because of the pandemic. EXHIBIT C.

Mr. Hoeltzel has attempted to sign-up for numerous other rehabilitation programs with limited success. For most, he has been wait-listed (for up to 2 years and counting). These include Non-Residential Drug Abuse Treatment, Anger Management, Life Connections Program, Criminal Thinking, and Basic Cognition. EXHIBIT D. Frequently, the staff has responded that the program is not available due to the pandemic. To this day, the BOP continues to operate on a "Modified Operational Schedule" that has reduced programming. Meanwhile, the waitlists have ballooned to the point that many inmates are likely to be release before they receive the benefit of these important programs.

Courts have found that the pandemic-related lack of rehabilitative services weighs in favor of sentence reduction. "It is additionally clear that to the extent that a goal of incarceration is to provide a particular individual with services of rehabilitation, months spent on lockdown in a cell without access to programming does not further that goal." United States v. Cruz, 2021 U.S. Dist. LEXIS 66485, at *21 (D.Conn. 2021) (granting a 9 month sentence reduction). See also, United States v. Dones, 2021 U.S. Dist. LEXIS 243953, at *8 (D.Conn. 2021) (In granting a 40 month sentence reduction, "Courts have granted motions for compassionate release based upon the theory that the COVIC-19 pandemic has created disproportionately harsh sentences and limited rehabilitative resources available to incarcerated people"); United States v. Janczewski, 2021 U.S. Dist. LEXIS 176163, at *4-5 (E.D. Mich. 2021) (A. Tarnow) (citing lack of available rehabilitation programs as a factor favoring reduction)

### 3. Lack of adequate medical care at FCI-Milan is an extraordinary and compelling reason for a reduction in sentence (inability to perform self-care)

It's difficult to determine if the lack of adequate medical care at FCI-Milan is a direct result of the COVID-19 pandemic, but there is no doubt that the pandemic has exacerbated what was already a strained system. Since the beginning of the pandemic, FCI-Milan Health Services has lost their only physician (Scherle), only pharmacist (Waite), their most experienced nurse practitioner (Weaver), x-ray techinician, technician, dentist, and Health Services Administrator (Brown), and none of them have been replaced. FCI-Milan has not had an on-site physician for nearly 2 years. Regular chronic care evaluations for inmates with chronic medical concerns and disabilites like Mr. Hoeltzel are no longer occurring, and the waitlist for preventative dental care is nearly 4 years long. EXHIBIT E. The clinic was open daily for walk-in visits ("sick-call") is now closed to inmates more often than not. EXHIBIT F is a sign recently posted in the Health Services hallway informing sick or injured inmates who sought attention that they were out of luck (note medical tape on sign).

Most strikingly, FCI-Milan Health Services has lost its only independent accreditation by an outside body, the Joint Commission for Healthcare Organizations. Federal law requires that FCI-Milan Health Services and all BOP healthcare facilities maintain accreditation by the Joint Commission. See BOP Program Statement 6010.05(10) and EXHIBIT G. In response to a complaint about his care at FCI-Milan, Mr. Hoeltzel received a letter from the Joint Commission reporting that FCI-Milan is no longer accredited by their organization. EXHIBIT G. Mr. Hoeltzel sent an email to the FCI-Milan Health Services Administrator inquiring about their accreditation status (EXHIBIT G) and received no response (possibly because there is no HSA?).

Mr. Hoeltzel's particular inadequate healthcare contributes to the finding of extraordinary and compelling reasons warranting a sentence reduction. A few examples of this substandard care include:

a) Mr. Hoeltzel has been appropriately classified as "chronic care" due to his history of congenital heart disease and heart valve surgery. Per BOP policy, chronic care patients are supposed to be evaluated by a physician at least annually. Mr. Hoeltzel last had a chronic care evaluation on 01/27/2020. In his visit note, Dr. Sherle directed that Mr. Hoeltzel should "F/u with MD in 1 year for CCC Visit." EXHIBIT H. Mr. Hoeltzel has not had a Chronic Care Clinic ("CCC") evaluation for over 27 months.

b) Mr. Hoeltzel has not had subspecialist-recommended follow-up for his retinal vessel clot. During the first surge of the pandemic, Mr. Hoeltzel developed symptoms of retinal detachment (visual loss with flashing lights) while locked in his cell 23 and 2/3 hours a day. There was no routine health checks, and FCI-Milan required that each inmate fill out a form and submit it in order to be evaluated for medical complaints. The day-shift correctional officer failed to bring Mr. Hoeltzel said form for 3 days, despite his repeated requests. Mr. Hoeltzel finally snuck out of his cell and delivered a handwritten note to a nurse delivering pills to others in the unit. EXHIBIT I.

Upon urgent evaluation by a retinal specialist, Mr. Hoeltzel was found to have a clot in one of his retinal vessels resulting in a "cotton wool spot," and a permanent blind spot in the field of vision of his right eye that persists to this day. Given Mr. Hoeltzel's history of COVID-19 symptoms several weeks earlier, his extensive COVID-19 exposure at FCI Milan, and reports in the medical literature of similar clotting complications to the eyes of people with COVID-19, the subspecialist concluded that Mr. Hoeltzel's growing blind spot was most probably due to COVID-19. EXHIBIT I.

Most notably, the retinal ophthalmology subspecialist recommended that Mr. Hoeltzel follow-up in 1-2 months for "DFE OU, 50 degree FAF, and color photos OU." EXHIBIT I. This 1-2 months follow-up was recommended nearly 2 years ago. Hoeltzel

has had <u>no follow-up</u>, nor any explanation as to why.

c) Prior to that, on 11/14/2019, Mr. Hoeltzel brought up a bleeding skin lesion on his back while at a Chronic Care Clinic visit. Upon seeing the lesion, the nurse practitioner told Mr. Hoeltzel, "I hope you are a praying man." She had Mr. Hoeltzel see Dr. Scherle who referred him to a dermatology specialist. He was finally taken to see the dermatologist 10 months later on 08/20/2020. Noting the atypical nature of the lesion, the dermatologist performed a biopsy. To this day, Mr. Hoeltzel has not been able to obtain a result to that biopsy from FCI-Milan Health Services, for a lesion first evaluated 30 months ago and biopsied 29 months ago. He hopes it is not cancer. EXHIBIT J.

d) The government and the BOP have made much of their effort to respond to COVID-19. Thus, one would think they would prioritize providing COVID boosters to inmates. However, Mr. Hoeltzel started requesting his COVID-19 booster in November 2021. Each month, he placed a request with Health Services. EXHIBIT K. Having previously received his yearly influenza vaccine in October of 2019 and 2020, he also began requesting his 2021 influenza vaccine at the same time. By his fourth request in February 2022, after the Omicron variant had already set new record high numbers of actively infected prisoners in the BOP, Mr. Hoeltzel received the response, "Please realize that we have been short staffed for a while now." EXHIBIT K.

Finally, in the middle of March 2022, as the CDC begins considering recommending a second booster, Mr. Hoeltzel received his first COVID booster. Less than a week later, despite the clear CDC recommendation that no other vaccine be given within 14 days of the COVID shot, Mr. Hoeltzel recieved his 2021 flu shot in March 2022, well after flu season was over.

e) Meanwhile, Mr. Hoeltzel got low on his medications. He contacted both pharmacy and his nurse practitioner in a timely fashion and received no response from either.

Subsequently, he ran out of his medicaitons and developed symptoms of withdrawal. Even his plea to anyone in health services that might listen, describing his withdrawal symptoms and urgently asking for refills went unanswered. Eventually, the pharmacy technician was able to intervene on Mr. Hoeltzel's behalf, but this just serves as another example of FCI-Milan's lack of capacity to provide even routine health care. EXHIBIT L.

This sub-standard healthcare in the BOP is neither isolated nor unnoticed. "The system of care at the FCI Sheridan does not allow for adequate access to care. Access to care is a fundamental aspect of the care system. Without access to care, adults in custody are essentially left without healthcare, much to their peril," stated corrections medicine expert Michael Puerini, M.D. in a recent court filing. See Stirling v. Salazar, Case No. 3:20-cv-00712, ECF #98 (D. Ore. Feb. 4, 2022). The same applies to FCI-Milan, and constitutes extraordinary and compelling circumstances that favor a reduction in Mr. Hoeltzel's sentence.

Congress has also taken note. The U.S. Senate recently created a taskforce named the Senate Bipartisan Prison Policy Working Group to address, in part, "critically low staffing levels that have hampered [medical care], the rapid spread of COVID-19, [and] a failed response to the pandemic."

Not surprisingly, courts have found that the lack of available and appropriate medical care is a factor contributing to extraordinary and compelling reasons for reduction in sentence. See, e.g., United States v. Qadar, 2021 U.S. Dist. LEXIS 136980, at *25-26 (E.D.N.Y. 2021) ("While harsh conditions of confinement alone are insufficient, if those conditions deprive defendants of the services that they need to treat serious mental and physical health issues, such deprivations may support a finding of extraordinary and compelling reasons"); Newell, supra at *5 ("[T]he spread of the virus appears to have affected the prison's ability to provide consistent medical care. The BoP has not timely provided all inmates with medical examinations

for COVID-19 related illnesses when requested and appropriate, or for non-COVID related illnesses when ordered." Granted 9 month reduction in sentence); United States v. Foozailov, supra at *6 ("Defendant's worsening vision problems and [his prison's] treatment of those problems has also made Defendant's incarceration far harsher than anticipated at sentencing"); See also, Hatcher, supra at *12; United States v. Nieves-Feliciano, 2021 U.S. Dist. LEXIS 59314, at *12 (D. Conn. 2021).

### 4. Mr. Hoeltzel's ability to perform self-care in the prison environment has been significantly diminished

While no longer binding, the Sentencing Commission recognized in its policy statement that an inability to provide self-care could, in combination with other factors, constitute extraordinary and compelling circumstances. U.S.S.G. §1B1.13 cmt. 1(A). Inadequate medical care, as experienced by Mr. Hoeltzel, diminishes has ability to perform self-care. Newell, supra at *6 ("If an inmate experiences symptoms, that inmate cannot arrange for a COVID-19 test or obtain medical care on his own. In other words, the ability of the defendants to provide self-care within the environment of the correctional facility is substantially diminished").

Moreover, exercise and proper diet are the primary 'self-care' treatments for weight and cholesterol. Being locked in his cell or housing unit for well over a year made it impossible for Mr. Hoeltzel to exercise regularly, and the "heart healthy" diet previously offered by the BOP was discontinued at the beginning of the pandemic.

Prior to the pandemic, Mr. Hoeltzel did not have hyperlipidemia (high cholesterol). Now he does. EXHIBIT H. Prior to the pandemic, Mr. Hoeltzel did not have a weight problem. Now... with a BMI of 29... he has a weight problem that puts him at high risk for severe complicaitons and death from COVID-19. These serious health conditions are a direct result of Mr. Hoeltzel's inability to perform self-care. See, e.g., United States v. Pina, 2020 U.S. Dist. LEXIS 113882, at *2 (S.D.N.Y. 2020) (the court found extraordinary and compelling reasons where prolonged lockdowns "substantially

-15-

curtailed" the defendant's ability to perform self-care in the form of exercise).

In summary, the restrictions imposed by the BOP have increased the general punitive nature of Mr. Hoeltzel's incarceration, and have specifically resulted in a substantial lack of rehabilitation opportunities, adequate healthcare, and ability to perform self-care... circumstances that combine to constitute extraordinary and compelling reasons warranting a reduction in Mr. Hoeltzel's sentence.

## II. THE FINALIZATION OF MR. HOELTZEL'S STATE CONVICTION HAS RESULTED IN EXTRAORDINARY AND COMPELLING REASONS FOR A REDUCTION IN SENTENCE

Another court in this district recently granted a reduction in sentence because of the potential impact of a state sentence that the court was not aware of at the time of federal sentencing... an impact which resulted in a longer duration of incarceration than the federal court intended at sentencing. "The Court finds that it is unfair and unjust to the Defendant that the Court was unable to consider the State charges as part of its analysis when Defendant was sentenced. The Court now exercises its discretion to reconsider Defendant's sentence under § 3582(c)(1)(A), finding extraordinary and compelling reasons exist in this instance." United States v. Chase, 2021 U.S. Dist. LEXIS 216145, at *9 (E.D. Mich. 2021) (also quoting Setser v. United States, 566 U.S. 231, 236, 132 S. Ct. 1463, 182 L.Ed. 2d 455 (2012), "Moreover, when the district court's failure to anticipate developments that take place after the first [of two] sentencing[s] produces unfairness to the defendant, the Act provides a mechanism for relief in 18 U.S.C. § 3582(c)(1)(A).").

In this case, Mr. Hoeltzel receieved a state sentence on February 13, 2019 of 5-15 years which this Court was unaware of when it sentenced Mr. Hoeltzel in December 2018, and which has resulted in a prolongation of Mr. Hoeltzel's federal incarceration by over 24 months, disqualification from alcohol abuse treatment recommended by this Court, and prolongation of his overall punishment by resulting in lifetime registration as a sex offender. This Court was unable to consider any of this at the time it sentenced Mr. Hoeltzel.

## 1. Mr. Hoeltzel's State sentence has prolonged his federal incarceration by more than 2 years.

Because the max of his state sentence is potentially 5 years longer than his federal sentence, the Michigan Department of Corrections placed a detainer on Mr.

Hoeltzel's BOP custody. This detainer automatically disqualifies Mr. Hoeltzel from both transfer to 'community custody' and early release from earned First Step Act Time credits.

a) Mr. Hoeltzel's MDOC detainer disqualifies him from any transfer to community custody in the form of either halfway house or home confinement, or some combination of the two. Ordinarily, a 120 month sentence would have qualified Mr. Hoeltzel for 12 months of community custody, meaning that 12 months before the end of his release date, he would have been transferred from prison to a community setting.

Moreover, First Step Act Time Credits can be applied towards early transfer to community custody (see next). Therefore, given that the MDOC detainer disqualifies Mr. Hoeltzel from transfer to community custody, and based on his projected rate and completion of rehabilitation programs to earn First Step Act Time Credits, Mr. Hoeltzel will end up spending more than 24 months more in prison than this Court could have anticipated.

b) According to Mr. Hoeltzel's FCI-Milan Unit Team, the MDOC detainer disqualifies Mr. Hoeltzel from applying First Step Act Credits to shorten his sentence by 12 months.

Indeed, by statute, Mr. Hoeltzel is eligible to earn (and has been earning) First Step Act Time Credits. 18 U.S.C. 3632(d)(4)(D). The BOP is applying the first 365 days of those credits towards sentence reduction. 28 C.F.R. § 523.44. Any credits over 365 days may be applied towards extra community custody. Id.

To date, Mr. Hoeltzel has earned at least 320 days of FTA Time Credits, and he is on track to earn at least 365 days more. This means that, without the MDOC detainer, Mr. Hoeltzel's sentence would have been reduced by 12 months, a fact this Court was unable to consider at sentencing.

c) As a result of the MDOC detainer, Mr. Hoeltzel's time in prison will be extended 36 months beyond what this Court could have anticipated. The detainer disqualifies him from the "usual" 12 months of community custody, and it prevents him from applying earned First Step Act Time Credits towards 12 months of sentence reduction and at least 12 months additional community custody... a conservative estimate based upon Mr. Hoeltzel's projected rehabilitation efforts to date, including programs completed, programs he is currently participating in, and programs for which he is on the waitlist.

By sentencing Mr. Hoeltzel before his state sentence was imposed, the sentencing court could have only assumed that he would have benefited from all of these early transfer to community custody and early release opportunities. Mr. Hoeltzel's inability to benefit from these opportunities to leave prison early constitutes extraordinary and compelling circumstances for a sentence reduction, and is the basis for Mr. Hoeltzel's request for a 24-36 month reduction.

## 2. Mr. Hoeltzel's MDOC detainer precludes him from the benefits of residential substance abuse treatment (RDAP)

Based on Mr. Hoeltzel's history of treatment for alcohol abuse prior to incarceration, both this Court and the state court recommended that Mr. Hoeltzel receive substance abuse treatment in prison. Howeover, his MDOC detainer disqualifies Mr. Hoeltzel from the substantial benefits of the BOP's Residential Drug Abuse Program ("RDAP"), denying him the ability to fully fulfill one of the purposes of his sentencing. When considering reduction in sentence, this Court has previously lamented the unavailability of RDAP to a defendant. See Janczewski, supra at *4-5. EXHIBIT M.

## 3. Mr. Hoeltzel's state sentence prolongs his overall punishment

The sex offender registry is punishment. See Doe v. Snyder, 834 F.3d 696, 704-06 (6th Cir. 2016). After Mr. Hoeltzel's state sentence, he was required to

register for the rest of his life. While this Court also imposed the statutory requirement for Mr. Hoeltzel to register as a sex offender, it was unable to consider the extent or duration of this additional punishment at the time of sentencing. Being subject to the onerous requirements and liberty restrictions of the registry for the rest of his life represents a significant increase in the collateral consequences of Mr. Hoeltzel's conviction; collateral consequences which this Court has the discretion to consider when imposing a sentence. See, e.g., United States v. Stall, 581 F.3d 276 (6th Cir. 2009) (Upholding a child pornography sentence of one day in prison based in part on collateral consequences of being a convicted sex offender); United States v. Grossman, 513 F.3d 592 (6th Cir. 2008) (same).

Overall, the finalization of Mr. Hoeltzel's state sentence has resulted in extraordinary and compelling reasons to reduce his sentence including (a) a substantially longer time in prison, (b) disqualification from needed rehabilitation, and (c) a substantial increase in collateral consequences.

### III. THE PHYSICAL ASSAULTS SUSTAINED BY MR. HOELTZEL
### ADD TO THE EXTRAORDINARY AND COMPELLING
### REASONS WARRANTING A SENTENCE REDUCTION

On February 22, 2021, Mr. Hoeltzel was brutally assaulted by another inmate in an unprovoked attack because he is a sex offender who "disrespected" a Detroit gang mamber by neglecting to hold the door for him. Mr. Hoeltzel was beaten unconscious, sustaining a severe concusion, facial fractures, traumatic iritis (temporary visual loss), and a facial laceration. He received neither pain medication nor adequate medical evaluation for several days. Despite specifically identifying his attacker to FCI-Milan staff, Mr. Hoeltzel was confined to "Administrative Detention" (aka: the Special Housing Unit, "the hole," solitary confinement) for over 5 weeks without being able to contact his family, while his assailant received no punishment. EXHIBITS N and O.

After being released from segregation and moved to a new housing unit, Mr. Hoeltzel was attacked again without provocation, this time by an inmate having an apparent psychotic break from illicit drug use. While his injuries were less severe, this second incident only heightened the constant fear with which Mr. Hoeltzel now lives, jumpy and anxious that he will be attacked at any time and for any reason, plagued by vivid nightmares. He remains emotionally scarred from this level of violence that he has never before experienced first hand in his 51 years as a doctor and pacifist. Mr. Hoeltzel as much as predicted this when the Warden ordered him and others moved out of the safer confines of the Honors Unit. EXHIBIT P. And his anxiety is compounded by the fact that FCI-Milan staff continue to perpetuate a culture of violence against inmates with sex offenses... a culture that has resulted in frequent assaults (mostly unreported), and even murder. EXHIBIT Q. (note that Mr. Hoeltzel was celled just below the murderer in this case while in segregation).

As stated, Mr. Hoeltzel spent over 5 weeks in "administrative detention"

after his first harrowing assault. This Court has considered time in this type of

segregation in previous reduction in sentence cases. See United States v. Sherrod,

2021 U.S. Dist. LEXIS 147643, at *7 (E.D. Mich. 2021) (Tarnow, A):

> [Defendant] recounted during the hearing how he was placed
> in solitary confinement on more than one occasion, sometimes
> for as long as seventeen days... That [Defendant] was
> subject to such extreme measures, particularly when imposed
> for administrative convenience rather than punishment, is
> disturbing. See United States v. Bowlson, 2021 U.S. Dist.
> LEXIS 119868, at *8 (E.D. Mich. 2021) (discussing the
> debilitating effect of solitary confinement on mental health
> and noting that the United Nations has classified prolonged
> solitary confinement as a form of torture).

(Defendant granted 60 month reduction in sentence).

Certainly, the sentencing court could not have foreseen or intended for Mr. Hoeltzel

to experience the physical and lasting psychological trauma of being assaulted twice.

Such an experience constitutes an extraordinary and compelling reason for sentence

reduction.

## IV. §3553(a) SENTENCING FACTORS FAVOR A REDUCTION IN SENTENCE

Mr. Hoeltzel fully acknowledges the seriousness of his crimes. He reflects upon his conduct with remorse daily  and with a strong commitment to make amends to his victims, his family, and his community, and to live a law-abiding life for the remainder of his years. He understands that pleading guilty in a timely fashion was only one step in taking accountability for his conduct. Reducing his prison sentence today will not undermine the purposes of sentencing.

## 1. The BOP/government itself has determined Mr. Hoeltzel is not a danger to society.

a) The Court need look no further than the fact that the government itself has determined that, if released into the community today, Mr. Hoeltzel has a MINIMUM risk of recidivism. This was determined using the Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN"). According to the government, this personalized and evidence-based "risk and needs assessment system is used to determine the risk and needs of inmates in BOP custody. Specifically, the system determines the recidivism risk of each inmate and provides them with a recidivism score." See https://www.bop.gov/inmates/fsa/faq.jsp#fsa_system.

b) The PATTERN assessment system results in a score from 0-113, with 113 being the highest possible risk of recidivism upon release. Mr. Hoeltzel's score is zero (0). EXHIBIT R. Even though Mr. Hoeltzel plans to continue to participate in as much rehabilitation programming as available, including Sex Offender Treatment, it is worth noting that his current recidivism risk cannot go any lower, according to the government.

c) This score was calculated by Mr. Hoeltzel's BOP Case Manager, a correctional officer who knows Mr. Hoeltzel well and has closely followed his prison conduct and rehabilitation efforts. This is in contrast to the government's prosecutors who have never met Mr. Hoeltzel, but are likely to argue his dangerousness

based solely on his past conduct. Most courts recognize that BOP Staff are in the best position to individually assess an inmate's readiness for release.

d) The question of dangerous is likely moot in this instance. As stated, Mr. Hoeltzel is subject to a Michigan Department of Corrections detainer, the result of which being that Mr. Hoeltzel will be transferred to the MDOC upon his release from federal custody to complete his 5-15 year state term of incarceration. He will be eligible for state parole in February of 2024, but is unlikely to be paroled until he has had sex offender and drug treatment. Nevertheless, the Court should be reassured to know that he is already judged to be a MINIMUM recidivism risk even if released to the community today.

## 2. Mr. Hoeltzel's pre- and post-sentencing conduct has been exemplary

Mr. Hoeltzel has already demonstrated his ability to successfully comply with community supervision during his eleven months of pre-trial release, during which he continued intensive outpatient sex offender treatment and accumulated no violations. In prison, Mr. Hoeltzel has dedicated himself to helping others while improving himself. He has completed 20 rehabilitation programs, and has worked fulltime during almost his entire imprisonment. He has worked as a law clerk in the prison's law library, helping inmates navigate the legal system and BOP bureacracy for over 3 years, with several legal victories to his sole credit. He is currently taking correspondence courses in Paralegal Studies and Buddhist Studies. He has also worked for the prison's steel furniture factory for over two years. EXHIBIT S.

Impressively, Mr. Hoeltzel has never had a disciplinary infraction in prison, and he has earned every good behavior credit ("GCT") and First Step Act time credit ("FTC") available to him. He was hand-selected for preferred-housing in H-Unit, and is known for getting along with other prisoners of all backgrounds and offense-types.

**3. Reducing Mr. Hoeltzel's sentence will not result in an unwarranted sentencing disparity**

Mr. Hoeltzel is in no way trying to minimize his offense conduct. However, he asks the Court to note that numerous §2422(b) offenders have been granted compassionate release.

Moreover, the mine-run §2422(b) offender communicated sexually online with a minor, arranged to meet that minor for hands-on sexual acts, and took a "substantial step" towards making that sexual contact occur. The vast majority of those mine-run offenders without a prior criminal history received 120 month sentences, or less before the mandatory minimum was imposed. In comparison, Mr. Hoeltzel never attempted to arrange to meet or attempted to meet his minor victims. He understands that his conduct was morally reprehensible and psychologically damaging, but his individual actions fell short of attempted or actual sexual contact or violence, yet his sentence matched those with arguably more aggravated conduct. Thus, reducing his sentence will not create an unwarranted disparity.

**4. Reducing Mr. Hoeltzel's sentence will not diminish deterrence nor respect for the law**

In United States v. Bandrow, 2020 U.S. Dist. LEXIS 127031 (E.D. Mich. 2020), another court in this district granted compassionate release to a sex offender who had served only 18 months of a 60 month sentence (despite a Guideline Range of 210-240 months), and stated regarding his 18 months of incarceration, "[Defendant] has served a not insubstantial sentence in prison, and that lengthy period of custody is also long enough to achieve deterrence."

This Court more precisely explained the logic behind this conclusion in United States v. McConico, 2020 U.S. Dist. LEXIS 135718 (E.D. Mich. 2020) (A. Tarnow):

A reduction in [Defendant]'s sentence will not diminish
the general deterrent value of [Defendant]'s original
ten-year sentence. Individuals contemplating criminal
behavior could hardly be expected to rely on an
unforeseen event on par with a pandemic to reduce the
prison sentences they would risk by their actions.

Nor does a reduced sentence threaten to diminish
respect for the law. Respect for the law is promoted
by demonstrating its humanity as much as its rigidity.

## 5. Mr. Hoeltzel's ongoing rehabilitation plan

As stated, Mr. Hoeltzel understands that his greatest rehabilitation needs
besides employment are sex offender treatment and alcohol abuse treatment. Reducing
Mr. Hoeltzel's sentence by 12-36 months will automatically qualify him for Sex
Offender Treatment. EXHIBIT T is a recent email from FCI-Milan Sex Offender Management
Program Coordinator, Dr. Bates, stating that he will qualify for sex offender treatment
in "the next 1-3 years." The same is true of the BOP's Non-residential Drug Abuse
Treatment Program.

Should Mr. Hoeltzel somehow be released to the Michigan Department of Corrections
before he is able to complete either of these programs, it is highly likely that
the MDOC will require him to complete these programs in a Michigan prison before
granting parole. Most importantly, Mr. Hoeltzel knows that he needs this treatment,
and wants to participate in the programs.

## 6. With any sentence reduction, Mr. Hoeltzel's incarceration will continue

In the typical §3582 proceeding, the Court is weighing the Defendant's
circumstances against the possibility of early release into the community. That
is not necessarily the case here. The result of reducing Mr. Hoeltzel's sentence
will be the execution of his MDOC detainer, resulting in a direct transfer to state
prison to complete his state prison sentence of 5-15 years. While it is conceivable
that Mr. Hoeltzel will be paroled from the MDOC before the end of his original
federal sentence, he will then be in the community under triple-supervision: federal

supervised release, state of Michigan parole, and state/federal sex offender registry.
In addition, this Court has the authority to add conditions of home detention to
his federal supervised release, if deemed necessary. Ultimately, these non-custodial
forms of supervision also "curtail prized liberty insterests" and "the defendant
always faces the harsh consequences that await if he violates the conditions" attached
to such supervision. United States v. Gall, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005).

## CONCLUSION

Mr. Hoeltzel has demonstrated a number of factors unknown to this Court at
the time of his sentencing that now favor a reduction in his sentence, including
(1) the increased punitive nature of his incarceration due to consequences of the
COVID-19 pandemic, (2) the disqualification from early release opportunities resulting
from the finalization of his state sentence, (3) inadequate medical care, (4) pain
and suffering from multiple assaults by other inmates, and (5) §3553(a) factors
that weigh in favor of a reduction. Taken separately, each factor may not be extra-
ordinary and compelling enough to warrant relief, but taken together, the totality
of Mr. Hoeltzel's circumstances easily constitutes extraordinary and compelling
reasons to reduce his federal prison sentence and transfer him to state prison
early.

WHEREFORE, Mark F. Hoeltzel, pro se defendant, based upon the foregoing, respectfully
requests this Honorable Court to GRANT this motion and ORDER that his federal sentence
be reduced by 12-36 months, or by whatever term this Court deems appropriate.

Respectfully Submitted,

Date: May 12, 2022

Mark Hoeltzel
pro se
Reg. No. 56366-039
FCI Milan, P.O. Box 1000
Milan, MI. 48160

-27-

<u>**EXHIBITS**</u>

Note: Due to restriction on the size of envelopes that can be mailed from federal
prison, the exhibits for this motion have been mailed under a separate cover.



Mark Hoeltzel #56366-039
Federal Correctional Institution
P.O. Box 1000
Milan, MI. 48160





R E C E I V E D
MAY 19 2022
CLERK'S OFFICE
U.S. DISTRICT COURT

SJDhr

⇔56366-039⇔
Clerk Of The
U.S. District Court
231 W Lafayette BLVD
Fifth Floor
Detroit, MI 48226
United States

